

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0888-11

**DAVID MARK TEMPLE, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE FOURTEENTH COURT OF APPEALS
## HARRIS COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., and JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. PRICE and WOMACK, JJ., concurred. MEYERS, J., not participating.

### O P I N I O N

Appellant, David Mark Temple, was convicted of the murder of his wife, Belinda Temple, and sentenced to life imprisonment. The Fourteenth Court of Appeals affirmed Appellant's conviction. *Temple v. State*, 342 S.W.3d 572 (Tex. App.—Houston [14th Dist.] 2010). We granted discretionary review, and we will affirm the court of appeals's holding that the evidence is legally sufficient to support Appellant's conviction.

# I. FACTS

Appellant and Belinda met and married while they were students at Stephen F. Austin University. Later, they bought a corner-lot home in the Cimmaron subdivision located south of I-10 in Katy, Texas. This was near Appellant's childhood home, which was located north of I-10 off of Katy Hockley Road. Appellant worked as a teacher and coach at Alief Hastings High School, and Belinda was a teacher at Katy High School. At the time of Belinda's death, their son Evan was approaching four years of age, and Belinda was eight months pregnant.

Several witnesses testified that Appellant and Belinda were in a "good," "loving," and "caring" relationship. Appellant's family and several friends described them as a "compatible couple" in an "equal partnership." They stated that Appellant was supportive of Belinda's actions. They also testified that Appellant was a great father to Evan, that he and Evan had a "remarkable" relationship, and that Appellant was excited about the upcoming birth of his daughter, even helping to prepare the nursery.

However, several other witnesses testified to a darker side of the couple's relationship. Belinda's twin sister, Brenda Lucas, viewed Appellant as controlling. She testified that, during her last visit to their home at Christmas, Appellant and Belinda were not getting along, and Appellant made fun of Belinda's "big butt." Brenda stated that she told Belinda that she needed to "put her foot down" with Appellant.

Quinton Harlan, Appellant's friend and fellow coach at Alief Hastings High

School, opined that Appellant could be volatile, had a controlling personality, and was meticulous in his planning. His wife, Tammy, testified that Belinda was a strong-willed woman, but uncharacteristically submissive and meek when in Appellant's presence. Tammy stated that she would tell Belinda to stand up to Appellant and to tell him how she felt. Although she acknowledged that Appellant was a good father to Evan, Tammy explained that Appellant made derogatory statements about the manner in which Belinda raised Evan and kept the house. Both Tammy and Quinton testified that Appellant called Belinda "fat" and "ugly" in front of them. Tammy also asserted that Appellant called Belinda's family "crazy, white trash, fat" and that "he would say he didn't even want [Belinda] or Evan around them," even preventing Evan from spending time with Belinda's family.

During the summer of 1998, Appellant went to his high school reunion. Quinton testified that Appellant informed him that, on the first night, he met a girl that he used to date and they had spent some time together. According to Quinton, Appellant stated that they kissed when they were on the couch together, and when Quinton asked if they had had sexual intercourse, Appellant responded, "No, everything but that." Appellant further explained to Quinton that, even though he had not wanted her to, Belinda had gone to the reunion on the second night. Tammy testified that she spoke with Belinda before Appellant's reunion and insisted that she needed to go to it.

***Day of the Murder***

On Monday, January 11, 1999, Belinda was at work when she was informed that Evan was running a fever at day care. During lunch, Belinda picked up her son and took him to their house. At approximately 12:30 p.m., Appellant arrived home to watch Evan, which allowed Belinda to return to school for a meeting that lasted until 3:20 or 3:30 p.m.

After leaving school, Belinda stopped by the home of Appellant's parents to pick up some homemade soup. At 3:32 p.m., Belinda made a cellular telephone call to Appellant at home, which lasted for 30 seconds. Appellant testified that Belinda called him while she was en route to his parents' home. Appellant's father Kenneth testified that he spoke briefly with Belinda and that she left their residence at approximately 3:45 p.m. Witnesses estimated that it would take Belinda around 15 minutes to arrive home. In his statement to police, Appellant claimed that Belinda arrived at 3:45 p.m., but at trial, his testimony indicated that her arrival was closer to 4:00 p.m.

When Belinda arrived at the house, Appellant could tell she was tired. Several witnesses testified that due to the pregnancy, Belinda was often tired and had swollen feet. Appellant testified that because Evan was feeling better, he decided to take his son out so that his wife could rest. According to Appellant, he left with Evan around 4:00 p.m. and drove his blue, short-bed Chevrolet pickup truck to the small park in their neighborhood, Cimarron Park, just a couple of minutes away. Shortly after arriving there, however, he and Evan decided to leave and go to a larger park, Peckham Park, which was located several miles away. Investigators later returned to Cimarron Park with

photographs of Appellant and his truck, but no one recognized them. At trial when Appellant was asked why he took Evan to Cimmaron Park in the first place, Appellant stated that they were "[r]unning errands, killing time for Belinda to rest" before they ate and Belinda went to Bunco.

Appellant maintained that, on their way to Peckham Park, Evan wanted something to drink, so they stopped at a Brookshire Brothers Grocery Store located north of, and about six miles from, their home. Appellant acknowledged that there were other grocery stores that were closer to his residence. Several witnesses testified that a trip from Appellant's home to Brookshire Brothers would have taken approximately 12 minutes. Surveillance cameras recorded Appellant and Evan entering the store at 4:32 p.m. and leaving at 4:38 p.m. Appellant purchased drinks and cat food.

Appellant testified that, at that point, he chose not to go to Peckham Park so that he and Evan could return home in time to have dinner with Belinda before she went to play Bunco. But, before heading home, he decided to stop by Home Depot to look at shelving for the baby's room. Appellant and Belinda had been to the same store on the Saturday two days before; they had purchased some shelving brackets, which turned out to be the wrong size. He did not bring the "wrong brackets" with him when he returned to the Home Depot. Appellant and Evan were videotaped entering the store at 5:14 p.m. They were not videotaped exiting the store.

While the trip from Brookshire Brothers to Home Depot should have taken ten to

twenty minutes according to witness testimony, it took Appellant approximately 36 minutes, which he explained was due to traffic. During this drive time, Appellant was seen by an old high school friend, Buck Bindeman, at the intersection of Morton Ranch Road and the Katy Hockley Cutoff, coming from the general direction of Appellant's parents' home. Appellant later denied having been at this intersection.

Meanwhile, at 4:38 p.m., Belinda's twin sister, Brenda Lucas, called Belinda at home to tell her that their grandfather was ill. When there was no answer, she left a message. Then, at 5:10 p.m., Kenneth Temple called and left a message asking about the health of "little man." There was no answer when he again called the house at 5:30 p.m. or when his wife called at 5:40 p.m.

Appellant testified that he and Evan arrived home shortly after 5:30 p.m. Witnesses testified that it was approximately five miles or twelve minutes from Home Depot to Appellant's home. Neighbor Angela Vielma was walking to a friend's home when she saw Appellant's truck turn in front of her into his driveway. Inside the truck, she saw Appellant and a little boy. She estimated the time to be 5:25 p.m. From her angle, Vielma did not see Appellant's dog in the garage, but neither did she see Belinda's vehicle parked inside.

Appellant testified that he unbuckled Evan from his car seat and helped him out of the truck. He expected Evan to wait in the garage while he ran inside to tell Belinda that

they were home, and he would return to watch Evan ride his bike.[1]  However, when he

approached the back door, Appellant saw that the door was partially open and the window

had been smashed.  He stated that he immediately thought that the house had been

burglarized, so he picked up his son and ran across the street to his neighbor's home.

Michael Ruggiero was reading in the front room of his house when Appellant

began banging on the front door and yelling, "Mike, Mike, it's me, David.  Let me in."

Appellant said that it looked like someone had broken into his house and asked the

Ruggieros to take Evan and to call 9-1-1.  After handing Evan over, Appellant bolted

back to his residence.  Michael told his wife Peggy to call 9-1-1, and he went after

Appellant.  At 5:36 p.m., Peggy called 9-1-1 and informed the operator that someone had

broken into Appellant's residence.

As he pursued Appellant, Michael Ruggiero loudly called for him to wait up, but

Appellant did not slow down.  Appellant entered his back yard through the gate and

allowed the gate to close behind him.  Michael again called for Appellant to wait up, but

by the time Michael made it to the gate, Appellant was entering the house through the

back door.  Michael testified that Appellant slammed the back door behind him.

Appellant testified that he hit the door running full speed and hollering Belinda's

name—he found her balled up in the corner of the master closet, and he grabbed her feet

---

[1]Although Appellant had informed investigators that he had left Evan to ride inside the garage, he testified that there was not enough space in the garage for that and he had simply used poor wording.

to pull her flat. At 5:38 p.m., Appellant called 9-1-1.

Back outside, Michael was not able to make it any farther because he was confronted by Appellant's dog, Shaka, who was barking and coming toward him. Michael held the gate closed so that he would not be attacked;[2] the dog jumped up onto the gate and continued barking. Michael continued to loudly call out to Appellant. At that time, Natalie Scott returned to the neighborhood after picking up her children from day care. She asked Michael what was happening, and he informed her that it appeared that there had been a break-in at Appellant's residence. When asked where Appellant and Belinda were, Michael stated, "I don't know about Belinda, but David's inside the house." Scott drove to her home to look for an old dog leash that could be used to tie up Shaka but could not find one. She did not return to the scene because she saw Peggy Ruggiero approach to help her husband.

Peggy had walked over with their portable phone, so Michael suggested that she call Appellant because he had not gotten any response from him after he had entered the residence. She called but there was no answer. Michael asked his wife to hold the gate. He took the phone from her and walked around the residence to see if there were any other places where someone might have broken into the home. He did not see any other areas of attempted entry. Michael continued to unsuccessfully call Appellant on his

---

[2] Several witnesses testified that the latch on the gate was broken and would not close completely. Appellant testified that he had been keeping Shaka in the garage because of the broken latch.

portable phone.

Sergeant Sam Gonsoulin and Deputy Kathleen Johnson of the Harris County Constable's Office had been called to Appellant's residence to respond to a burglary. As they were en route, they were informed that someone had been shot. When the officers arrived, they were met by Michael and Peggy Ruggiero. Michael informed the officers that Appellant had gone inside the residence. Gonsoulin and Johnson walked up to the side gate where Shaka was still barking, growling, and "slamming" into the fence. The officers knew that they had to enter the residence by way of the back yard, and that they might have to shoot the dog to safely do so. They explained that they wanted to reach the victim inside but also did not know if there was still a gunman around.

As the officers prepared to enter the back yard, Appellant walked out of the home into the back yard. He calmly told the officers that his wife had been shot and that she was dead. The officers informed Appellant that they needed to enter the residence so he needed to do something to control Shaka. Appellant put his dog in the garage through the pedestrian door next to the fence and opened the gate for the officers. Shaka continued to bark in the garage.

Gonsoulin asked Johnson to wait outside with Appellant. Johnson testified that Appellant was quiet and appeared very calm. After a couple of minutes, other law enforcement officers and emergency medical personnel began to arrive. While they surveyed the crime scene, Johnson stood at the front door and testified that she never saw

anyone else going in or out of the house or garage.

Appellant was placed in a patrol car in the driveway, as was the routine procedure of separating witnesses. At one point, Appellant asked to speak with one of the investigating officers. He asked Detective Schmidt how much longer he had to sit in the patrol car, and Schmidt informed him that the officers might need to speak with him and that his partner may want to meet with him to take a statement. Appellant was agitated and asked why he would have to give a statement. Schmidt explained that he may need to describe his wife's last known activities.

### Crime Scene Investigation

Belinda's red Isuzu Rodeo and Appellant's blue Chevrolet pickup were parked in the garage. In the Isuzu, a Home Depot bag was on the passenger seat, which contained two wooden shelf brackets and a receipt from 5:32 p.m. on January 9, 1999. A cellular telephone was located in the console. In the Chevrolet, a bag of cat food was on the passenger seat, a jacket was on the floorboard, and Appellant's wallet was located in the driver's side door. Although taken some time after the murder, photographs of the pickup showed that no child's car seat was inside. The Isuzu was later towed to the processing-print stall, but the Chevrolet remained at the scene. Also in the garage, detectives found fresh dog food and a water bowl as well as a sleeping pallet for a dog.

The black metal back door appeared to have nine different window panes, but it was one single sheet of tempered glass with decorative trim. The portion of the window

pane closest to the door knob had been penetrated with a tool. The key to the back door was in the inside door knob, located six to eight inches from the hole. There were no pry marks on the door, and no damage to the interior side of the door.

The back door opened into a small foyer. Directly across from the door was a sectional couch and to the left of the foyer was the living room. The fireplace was on the same wall as the door. A wood hutch was located directly to the left of the door, between the door and fireplace. The television stand was also located on that wall but on the other side of the fireplace in the corner of the living room. The majority of the glass from the door's window pane was on the floor in the direction of the fireplace and the living room area. The farthest piece of glass found was thirteen feet from the door in the direction of the television. There was very little glass on either side of the threshold, and there was no glass on either the couch or the hutch.

Sergeant Dean Holtke and Detective Charles Leithner of the Harris County Sheriff's Office testified that it appeared that the glass in the door had been broken while the door was open because, had the door been closed, they would have expected there to be glass on the sofa. Appellant argued that glass was thrown into the living room when the back door slammed into the hutch. However, investigators did not see damage to the hutch or dents on the inside of the back door. Defense expert Max Courtney testified about his efforts to reconstruct the scene by building a door similar to Appellant's back door. He opined that the glass pattern found was consistent with the window being

broken while the back door was closed.

In the living room, the television had been removed from its stand and was on its side on the ground. There was a fresh scratch on the front edge of the stand, and the television's connections were still plugged in. The officers testified that the television still functioned when they had turned it on. However, Appellant's family took the television in for repairs on January 22, 1999. The repairman testified that the main printed circuit board and yoke had come loose and that there were slight distortions to the internal parts of the picture tube. He opined that this damage was consistent with the television either falling or being dropped.

Also in the living room, several drawers of the buffet (two top drawers and a bottom door) had been opened, but the contents were undisturbed. Likewise, in the dining room, the china cabinet appeared undisturbed.

Taking into consideration this evidence, several officers opined that the scene appeared to be a staged robbery. Sergeant Holtke specifically testified that the scene appeared staged. He stated that if the back door had been closed at the time the glass was broken, he would have expected to see the glass toward the couch, as opposed to being in the living room. Holtke also noted the undisturbed contents of the buffet, and he believed that the television damage was inconsistent with burglary because the scraping along the front of the tv stand suggests that it was just gently put down onto the ground. Detective Leithner similarly testified that it did not appear to be forced entry because of the glass

pattern and because he would have expected more damage to the television.

Continuing through the house, Belinda's purse was found in a downstairs closet, and nothing was missing from it. Her car keys were on the stairs. Friends and family testified that Belinda normally left her purse on the kitchen counter or breakfast bar and kept her keys next to her purse in a tray by a telephone on the breakfast bar. But Appellant disputed this, testifying that Belinda would put her purse in the closet under the stairs and drop her keys about a third of the way up the stairs.

Upstairs in the master bedroom, Belinda's jewelry box appeared undisturbed on one dresser as did jewelry belonging to Appellant in a tray on top of another chest of drawers. Appellant admitted that the burglar "didn't take one single thing that belonged to [him]." On January 13, 1999, Appellant's family reported to Farmers Insurance that the following items of jewelry were missing from Appellant's home on or about January 11, 1999: three pairs of earrings, two necklaces, and two watches. Appellant's mother, Maureen, had given the complainant most, if not all, of this jewelry. Law enforcement officers did not hear that any jewelry had been reported stolen until January 26, 1999, when they observed a report of it on television. At that time, Detectives Schmidt and Leithner met with Ted Wilson at the Harris County District Attorney's Office, and Wilson prepared a letter to Appellant's attorney requesting a list of the property allegedly missing from Appellant's residence. This list included ten pieces of women's jewelry. The list of missing jewelry was distributed to pawn shops in western Harris County and Fort Bend

County, but no items were recovered.

Belinda's body was found upstairs, laying face down in the master bedroom's closet. She had been shot in the back of the head, and the front of her face and brain were blown away. Detective Holtke testified that it appeared that Belinda had been kneeling when she was shot. All of the brain matter was low in the closet (*i.e.*, on the first row of clothes). The hanging clothes near Belinda's body had been pushed to the side at some point after Belinda was shot. Those clothes had a significant amount of blood and brain matter, and they appeared to have shielded the back wall of the closet.

Detective Leithner said that Belinda's head faced the wall and was underneath some hanging clothes. He testified that the injury to the back of her head was not immediately apparent because her long hair was covering that part of the wound. Leithner also testified that there was a great deal of blood and brain matter around her head, and the brain matter, when compared to the location of Belinda's head, was "[f]orward and some was off to the left."

Belinda was fully clothed and still wearing her shoes. She was also wearing a watch, a bracelet, a necklace, and rings on both hands. Her glasses were found broken on the ground near her. A cordless telephone was in or near Belinda's hand. The base of the telephone was on a dresser in the bedroom, and when Detective Schmidt pushed redial, he discovered that the last call had been made to Michael Ruggiero. The last number of the corded phone in the bedroom was 9-1-1, which had been called by Appellant upon

discovering Belinda's body.

Shotgun pellets and shotgun wadding were recovered from the closet near where Belinda had been shot. Some of the shotgun pellet fragments were consistent with being double-ought size buckshot. The wadding was consistent with being from a 12-gauge shotgun. Two rifles, a 30.06 and a .22, were found in the corner of the closet.

Dr. Vladimir Parungao performed Belinda's autopsy on the morning of January 12, 1999, and Dr. Dwayne Wolfe, the Deputy Chief Medical Examiner for Harris County, testified about the results. The autopsy confirmed that Belinda had received a shotgun wound to the back of the head and that her skull had been fractured as a result. The exit wound was at Belinda's right eye, and there was additional tearing across most of her face. There was no stippling around the entrance wound, but there was gunpowder residue or soot within the wound itself, as well as lead buckshot fragments. Consequently, Dr. Wolfe opined that the shotgun was fired while the end of the gun was touching or contacting Belinda's head. He also stated that Belinda's unborn child would have died quickly but not instantly.

Dr. Vincent DiMaio, the Chief Medical Examiner of Bexar County, testified that the shooter would definitely have some blood and tissue on him. He explained that blowback is always going to occur, but the amount will depend on three factors: whether it was a contact wound, the caliber of the weapon, and the extent of wound tears. The most explosive is a contact wound with a 12-gauge shotgun. However, Dr. DiMaio did

acknowledge that hair could catch some of the back spray.

Dr. Wolfe also testified that he would expect there to have been blowback on the gun and in the barrel. While there may be some spattering of blood toward the shooter, Dr. Wolfe explained that in a direct contact wound, "You may see some inside the barrel of the gun but generally not on the hands. You may see a little bit on the hands or even on the gun, but in a tight contact shot, frequently the blood and brain matter and other things end up going in the same direction as the shot."

Both experts additionally testified that it is difficult to determine a time of death.[3] In this case specifically, Dr. DiMaio could not evaluate the time of death. He testified that lividity could be seen in the crime scene photographs, but he could not tell if it was fixed or not. He further explained that rigor mortis appears two to four hours after death and fully develops at six to twelve hours. From the photographs, he could tell only that rigor mortis had begun. Dr. DiMaio stated that he obtained a rectal temperature, but its results were worthless—it placed the time of death at 6:45 p.m. when the investigation was already going on.

Similarly, Dr. Wolfe opined that it was impossible to calculate an exact time of death. He testified that he believed that fixed lividity was shown in the crime scene photographs, meaning that the death occurred seven to eight hours before the body was removed. However, he further explained that the time of death cannot be determined

---

[3]Detective Leithner testified that he believed the time of death was between 4:30 and 5:30 p.m., but he did not explain why.

based on lividity alone because the determination of time of death depends on assessing several different variables including the rigor mortis, body temperature, and ambient temperature. Because the rectal temperature put the death closer to around 5:00 or 5:30 p.m., Dr. Wolfe concluded that the rectal temperature and rigor mortis yield "two totally different times of death. So the best we can do really is say that she died sometime the day before."

### *The neighborhood at the time of the murder*

Detectives Tracy Shipley and Curtis Brown of the Harris County Sheriff's Office did a "short canvass" of Appellant's street. They went door-to-door to ask neighbors if they had seen or heard anything suspicious or of interest on the afternoon of the murder.

Barbara Watt returned to the neighborhood about 3:10 p.m. and stopped at the cluster of mailboxes located near Appellant's home. She did not notice anything unusual at Appellant's house. Nor did she notice anything unusual in the neighborhood when she later left her home around 3:35 or 3:40 p.m. or when she returned at 4:10 p.m.

Michael and Peggy Ruggiero, who lived across the street from Appellant, were talking in their garage with the door open around 3:00 p.m., and they did not hear anything coming from Appellant's house or observe anything unusual. Peggy went outside at 3:15 p.m. to wait for their children to get off the bus, and then the family returned home to start homework. Michael walked one of their children's friends home down the street at 4:00 p.m. Michael and Peggy then went for a walk. They followed

their regular route around the neighborhood from 4:20 to 5:00 p.m. At approximately 4:35 p.m., the couple noticed an older model, beige, four-door sedan speeding through the neighborhood. Inside were a couple of young gentlemen wearing baseball caps. The Ruggieros did not hear Shaka barking during their walk.

Cynthia and Jim Parker lived kitty-corner from Appellant's backyard, sharing the corner fence. Cynthia got home around 4:00 p.m. and then walked to the mailboxes between 4:20 or 4:30 p.m. She did not hear Shaka barking. However, around 4:30 p.m., the Parkers' dog was really excited about something in the back yard, running the fence and barking. The Parkers also noticed that their own shed door was open, which was unusual.

On his way home at 4:15 or 4:20 p.m., Michael Schrader stopped at the mailboxes near Appellant's house. He did not see anything unusual in Appellant's yard, driveway, or street. He also did not hear Shaka barking.

Natalie Scott lived on the same street as Appellant and the Ruggieros. She returned home at approximately 4:30 p.m., and she did not see anything unusual when she passed Appellant's house. Scott left her house at about 5:10 p.m. to pick up her daughters from day care, and again, she noticed nothing unusual and did not hear Shaka. When Scott got back to the neighborhood at 5:30 p.m., she saw Michael Ruggiero at Appellant's back gate.

During the late afternoon, Angela Vielma got into a fight with her live-in

boyfriend and walked out of her house. After a while, she attempted to reenter the house, but the door was locked. Believing that her boyfriend had locked her out, Vielma began walking to her friend's home down the street. Her friend lived on Appellant's street. As Vielma was walking, she observed a blue truck containing Appellant and Evan pass her and turn into Appellant's garage. This occurred around 5:25 p.m., and Vielma did not hear any gunshots or dogs barking when she was outside and near the Temples' home.

The Roberts family shared a back fence with Appellant. Alexander Roberts had three sons in elementary school, and on the day of the murder, the boys arrived home from school shortly after the bus dropped them off at 3:57 p.m. Law enforcement officers stopped by the Roberts' house that evening to ask the father if he had heard or seen anything peculiar that day. It was then for the first time that Roberts' sons informed their father and officers that they had heard a "boom." Detective Leithner testified that the Roberts boys were interviewed four days after the murder to determine the timing of the alleged gunshot. According to the eldest brother, fifteen minutes after arriving home, they began watching a movie. Each of the boys testified that, while watching the movie, they heard a loud boom that they believed sounded like a gunshot. Only the oldest brother identified it as occurring "[t]wenty-six minutes and five seconds" into the movie. Roberts acknowledged that the murder was the "[b]iggest thing that probably ever happened to [his sons] up to that time in their life."

During closing arguments, the State suggested that Appellant's upstairs closet was

a good place to hide a shotgun blast because it was the room that was "most protected, most covered up, surrounded by clothes, an interior room inside the bathroom, inside the bedroom."

### *Appellant's Statement to Law Enforcement*

On the evening of the murder, Sergeant Gonsoulin transported Appellant to a satellite office of the Homicide Division, and Detective Leithner met them there. Leithner testified that Appellant was not in custody or under arrest and that Appellant did not appear to have any scratches or cuts. Leithner described Appellant as cooperative. He asked Appellant if he would be willing to put his activities on the date of the murder in a formal statement, and Appellant agreed to do so.

Leithner stated that he informed Appellant of his rights. Those rights were also in the first paragraph of the form that would include Appellant's statement. Leithner additionally informed Appellant that he was not under arrest, that he was free to go if he wished, and that he did not have to talk with officers if he did not want to. Leithner asserted that Appellant indicated that he understood his rights and that he decided to waive his rights and to talk.

The interview started at 8:35 p.m., and the statement began at 8:50 p.m. According to Leithner, the atmosphere was non-confrontational as he typed up the statement and discussed it with Appellant. After Leithner finished typing, he printed out a copy and asked Appellant to read through it to check its validity and to make any

corrections. Appellant indicated that he wanted two changes made.[4] After the corrections were made, Appellant signed the written statement in the presence of two other officers at 9:50 p.m.

Leithner testified that, after this was completed, his next objective was to re-interview Appellant and go over some questions and inconsistencies. For example, Leithner asked Appellant to identify the park to which he had taken Evan—Appellant first said Peckham Park but, within seconds, changed his answer to Cimmaron Park, which was the park in their neighborhood. Additionally, Leithner discussed with Appellant that it looked like the door was open when the glass was broken, that it seemed odd that a burglar would shut the door after he had just broken it, and that it did not appear that a burglar had attempted to take the television because it had not been damaged. Leithner also questioned why the officers could not get in the backyard because of Shaka, but the unknown intruder just walked in.

Leithner testified that, during this questioning, Appellant became more irritated and aggressive with him. According to Leithner, Appellant would not look him in the eye, and he would "shake and bounce" in his chair as he spoke with the officer. Appellant was also hesitant in many of the answers given, and he did not shed any tears. Leithner stated that Appellant's entire session at the police station lasted for a total of

---

[4] First, Leithner had typed, "He was teaching at the time they got married," and Appellant wanted to correct it to, "They were both going to college at the time they were married." Second, Appellant wanted to rephrase "She slept" to "She was resting," referring to the time period after Belinda came home.

three and a half hours, and at the end, Leithner informed Appellant that he would have to consider him as a suspect at that time because he could not resolve some of the information. Leithner explained to Appellant that he was in the "inner circle" and, because he appeared to not be cooperating in all of his answers, they could not eliminate him at that time. At trial, Leithner explained the "inner circle" theory or how he initially investigates homicides:

> A. [LEITHNER]: Anytime we go to a homicide scene and we don't have a suspect that's already there with, shall we say, a smoking gun, we always look at the inner circle, which is family and friends first before we broaden our scope, and during that time we try to eliminate who we can.
>
> Q. [STATE]: And why do you start with the inner circle?
>
> A. I guess just in experience-wise, it's a greater percentage that's involved in these type[s] of crimes are inner circle people.
>
> Q. And when you say "inner circle," what's the innermost circle?
>
> A. The innermost circle would be husband-wife, mother-son/daughter, the immediate family.

**Appellant's Parents' Statements to Law Enforcement**

Appellant's parents, Kenneth and Maureen Temple, were also asked to give statements, and they did so. Detective Tracy Shipley interviewed Maureen, and Detective Leithner interviewed Kenneth. Maureen testified that she was in a state of disbelief and did not have a clear recollection of that evening. She did recall though that Shipley was very pleasant and tried to help her get her statement out. Kenneth testified that he was seated right outside the doorway where Maureen was and he "probably attempted to

correct her a couple of times on her response." Regarding his own experience, Kenneth testified that he and Maureen were treated like "a guilty party. Not with any particular dishonor, but very reserved." Both Kenneth and Maureen testified that, after they had given their statements, they were taken into a room where Leithner and Shipley told them that they thought that Appellant was guilty of murder.

***Appellant's Relationship with Heather Scott***

After Belinda's murder, Officer Paul Hughes with the Alief Independent School District Police Department informed Detective Schmidt that Heather Scott might be a potential witness in the murder investigation. Testimony revealed that it was a poorly kept secret at Alief Hastings High School that Appellant was involved with Heather, another teacher at the school, and the detectives began investigating that lead.

In the fall of 1998, the teachers and coaches of Alief Hastings High School met each week for happy hour. Appellant testified that he attended four or five happy hours. Quinton Harlan, Appellant's friend and fellow coach at Alief Hastings High School, testified that Appellant would chide him for not attending many of the happy hours. Appellant would call him a "pussy" and tell him that he had to run his house and be the man of the house. Quinton also testified that, when Appellant socialized with the other coaches, Appellant would think of stories for them to tell their wives about their whereabouts.

Early in the 1998-1999 school year, Appellant and Quinton met Heather Scott.

Both men began a flirtatious relationship with Heather and occasionally saw her after school. Heather knew that both men were married. Quinton testified that he sent flirty e-mails to Heather and went to her house on four occasions. He stated that they kissed but did not have sex. Appellant testified that he went to several happy hours with Heather, and afterwards, he drove her home and kissed her goodnight.

Quinton testified that in November 1998, Appellant asked him to come over to his house. When he arrived, Appellant got into Quinton's truck, and they drove around the neighborhood and discussed their intentions with Heather. Quinton stated that Appellant asked him if he would leave his wife for Heather, and Quinton responded, "No." When Quinton asked Appellant if he would be willing to leave Belinda for Heather, Appellant responded, "I don't know." Heather's roommate, Tara Hall, testified that, as Christmas approached, Appellant and Heather were seeing more of each other, and Appellant gave Heather several gifts including flowers and perfume as well as a simple gold necklace for Christmas. Hall described Appellant as being "very polite" and "affectionate" to Heather.

Later, Heather invited Appellant to a New Year's Eve party at her townhouse. Appellant told Belinda that he was going on a hunting trip with some friends over that weekend. However, Brenda Lucas, who was staying with Belinda at the time, testified that Appellant carried no hunting gear or suitcase with him when he left his house. Instead of hunting, Appellant attended Heather's party and spent two nights with Heather, returning home on January 2, 1999.

Heather and Tara Hall each gave statements to police. In her first statement, on January 12, 1999, Heather stated that she had seen Appellant occasionally over the past three months. She explained that she would see Appellant once a week at happy hour, but denied that they had gone on a date together. Heather stated that their relationship was casual and romantic. She also mentioned that on January 5, she had a discussion with Appellant about not continuing their romantic relationship. In Hall's first statement, she stated that she knew that Heather and Appellant were affectionate with each other, but at trial, she explained that she felt uncomfortable talking about their relationship in more detail.

After speaking with an attorney, the two women decided that they needed to give second statements to provide more information. Thus, on January 26, 1999, Heather spoke with officers again. She informed them that Appellant had spent New Year's weekend with her and that they had sex. Heather also added that on January 8, 1999, Appellant told Heather that he loved her and that she responded that she felt the same way about Appellant. Similarly, in Hall's second statement, she clarified that she knew that Appellant and Heather had been engaged in a sexual relationship and that their relationship was much more serious than she had previously stated.

At trial, testimony revealed that, during the three months before the murder, Appellant and Heather engaged in sexual intercourse together on at least two or three occasions. Appellant testified that their relationship was casual and romantic, but he

denied having told Heather that he loved her. Appellant further testified that, even though he had the affair, he loved Belinda. He also recognized that, although it was not a serious relationship, it was still wrong.

### *Appellant's Actions after the Murder*

On Wednesday, January 13, 1999, friends of Belinda Temple went to the home of Kenneth and Maureen Temple to express their sympathy. At one point, the guests were forced to stand outside. They were not allowed inside because Appellant, Kenneth, and Appellant's two brothers, Kevin and Darren, were having a meeting. During this meeting, the men asked Appellant if there was anything that they needed to know. Kenneth testified that Appellant initially denied that he had anything to share, but he finally informed them that he had had an "affair." Maureen testified that, shortly after this meeting, she, too, was informed by Appellant of his weekend with the teacher.

Quinton and Tammy Harlan were among those at the Temple's home on January 13. Quinton testified that he found himself alone with Appellant in the kitchen, and Appellant asked him how Heather Scott was doing. Quinton told Appellant that he was going to have to tell his parents that he and Heather had been in a relationship, and Appellant responded that he had already told them.

On the following day, the day before the funeral, Appellant pulled Belinda's sister, Brenda, into a bedroom to tell her that he had not gone hunting and that he had instead gotten real drunk and kissed a girl. Brenda testified that when she asked who the girl

was, Appellant said that she was someone he knew. Brenda testified that she was upset and got up to leave the bedroom. Appellant told her that he would not do anything to hurt Belinda—he knew that he was wrong for what he had done and he hoped that Brenda did not hate him.

Shortly after the funeral, Appellant called the Harlans' residence, and he apologized to Quinton for having to go through "this." Appellant also asked Quinton to tell Heather that he was sorry that she had to go through "this."[5]

A few weeks after the funeral, Quinton met Appellant for lunch. According to Quinton, Appellant told him that the police were following him and that they had not treated him well. In response, Quinton asked, "Why aren't you talking to them? . . . [W]hy don't you clear yourself and make it, you know, so you don't look guilty?" Appellant informed Quinton that his attorney had advised him not to talk to the police. Still, he also mentioned that he had gone to the store in order to get some cat food and he had a receipt for that purchase. When Quinton asked if he wanted to find out who had murdered Belinda, Appellant answered, "[W]hat difference is it going to make? It's not going to bring her back."

At another lunch meeting in February, Quinton mentioned that there were some

---

[5]Tammy Harlan had answered the telephone when Appellant called, and she remained on the line while Appellant and Quinton talked. After their conversation ended, Tammy became very angry with her husband, and they had an argument. She asked Quinton, "Why is he asking about another woman when his wife and unborn child just died and why are you the one that's going back and forth as a messenger boy?" Quinton then disclosed that he had also had a relationship with Heather Scott.

rumors going around that the boys who lived next door to Appellant might have had something to do with Belinda's death. Quinton testified that Appellant was surprised because he had not heard that.

Quinton and Tammy Harlan testified before the grand jury on April 7, 1999. That evening, Appellant called the Harlans' residence. Tammy testified that when she answered, Appellant asked her about what she had said to the grand jury. Tammy stated that she was "taken aback" because she was not supposed to have testified, and she was shocked that Appellant knew that she had done so because they had just returned home. Tammy stated that she told Appellant, "We're not supposed to talk about this." Appellant then asked to speak to Quinton. Quinton testified that Appellant asked him, too, what he had said to the grand jury and the police. Quinton told him that he had told the truth, to which Appellant responded, "You know, you need to keep your mouth shut."

That same month, Quinton was driving down I-10 to his wife's place of business when he noticed Appellant driving behind him. Quinton testified that, instead of following his normal route, he decided to drive down another street to see if Appellant would follow him. Before reaching the business, Appellant pulled up and got out of his truck. He walked over to Quinton's truck and asked him, "What are you saying to the police?" Quinton responded, "I'm just telling them the truth." Appellant then said, "You keep your damn mouth shut."

Similarly, Tammy testified that around the same time, she was driving to her place

of business when she noticed that Appellant had pulled up next to her vehicle. Tammy stated that she got scared and sped up. Appellant continued to follow her, so when she reached her place of business, she grabbed her gun and ran inside. Tammy stated that Appellant pulled up in front of the business, but he did not stop for long.

Appellant resumed his relationship with Heather Scott shortly after Belinda's murder. Heather's roommate, Tara Hall, testified that Heather received flowers from Appellant on Valentine's Day of 1999. Heather testified that she and Appellant began seeing each other again in March of 1999. Hall stated that Appellant visited Heather several times that spring, and that he and Heather planted flowers on the patio. Natalie Scott, Appellant's neighbor, testified that she saw Appellant at a steakhouse in September 1999, and he had his arm around a thin, blonde woman in a red dress.[6] When she attempted to talk to Appellant, he looked away. Kenneth Temple testified that, about six months after Belinda's death, he learned that his son was dating Heather. Appellant's brother, Kevin, and sister-in-law testified that they were very upset when they learned Appellant was dating Heather and did not speak to him for several months. Appellant and Heather became engaged in January of 2001 and married on June 9, 2001.

### Shotgun Evidence

Appellant and his family testified about the shotguns they had owned. They insisted that Darren, Appellant's older brother, and Kevin, Appellant's younger brother,

---

[6] Heather denied having gone to that steakhouse with Appellant before their marriage, and she denied ever having a red dress.

had owned 12-gauge shotguns, but Appellant had owned only a 20-gauge shotgun. For Christmas of 1980, Darren and Kevin received 12-gauge shotguns while Appellant received a 20-gauge shotgun. In the early 1980s, Appellant destroyed his 20-gauge shotgun when he got mud in the barrel. The damage was not repairable, so Kevin cut off the end of the shotgun and put duct tape around the end of the barrel to keep from getting cut. Kevin testified that he threw the gun away before he went to college. The family maintained that, after his gun was destroyed, Appellant never owned another gun, although he might have borrowed the guns of family or friends.

Kevin testified that his shotguns were locked in a gun case underneath his bed in his Houston apartment on the day of Belinda's murder. Similarly, Darren testified that the 12-gauge shotgun he had received from his father in 1985 was at his home in Coppell, Texas in January 1999. Darren also stated that his father did not possess a gun at that time.

Clinton Stockdick was Kevin Temple's best friend during the 1980s. Stockdick hunted with Appellant "a couple times" during the holiday months of the mid-1980s and when Appellant returned home from college for the holidays. Stockdick testified that the Temple brothers stored their guns in a closet and shared them with each other. He stated that the brothers always used a 12-gauge shotgun, and he never saw them use 20-gauge shells or shoot 20-gauge shotguns. They also loaded their own shells because it was cheaper than buying new shells, although Stockdick never saw them with double-ought

buckshot shells.

Stockdick also explained that, "probably" in 1985 when he was in the eighth grade, Kevin showed him the split barrel of a 12-gauge shotgun. The split had occurred when mud got into the barrel. Stockdick saw a shotgun a year later, and it had been sawed off. Although he could not say "for sure if the split-barrel shotgun ended up being the sawed-off shotgun," he knew that he had seen a 12-gauge sawed-off shotgun in Kevin's bedroom. He also testified that he had seen it again a couple of weeks later in Kevin's bedroom; this time it had some duct tape over the bolt to act as padding. Stockdick stated that he last saw that gun in eleventh grade.

Quinton Harlan testified that, although they never went hunting together, he had several conversations with Appellant about hunting and weapons. Quinton stated that, at least a year before the murder, Quinton had purchased a shotgun and told Appellant about it. He explained that many times Appellant would comment on gun advertisements posted in the sports section of the newspaper, and "months prior" to the murder, Quinton and Appellant talked a couple of times about how they should get concealed handgun permits. Appellant also shared stories with Quinton about hunting in the fields behind his parents' house when growing up.

After the murder, several individuals were at Appellant's home to help him move out. Quinton testified that he went into the dining room to pick up a box—it was partially open, and he saw that the box contained some shotgun shells and a hunting vest. Quinton

stated that the vest appeared to be the same vest that he had previously seen in Appellant's garage. On the day that Appellant moved out, Jenifer Stockdick also saw that Appellant was in possession of some shotgun shells. Appellant testified that the shotgun shell boxes seen were left over from long ago and that he had not hunted since 1991 or 1992.

Law enforcement officers spent much time searching for the murder weapon in the Katy area. They searched on foot, used K-9s, sent divers into bodies of water, and employed DPS heat-seeking equipment on a small plane, but these efforts were futile. For several months after the murder, the Sheriff's Department also took into custody any shotgun that was found or turned in to the police in and around Katy, including several 12-gauge shotguns. Each gun was processed, and none had blood spatter, brain matter, or glass. Matthew Clements, the firearms and tool-mark examiner, explained that shotgun barrels do not have rifling, a series of grooves that have been cut into the barrel that will leave striation marks on the bullets. Hence, one generally cannot identify if a particular pellet or slug may have come from a particular shotgun.

### Other Investigation Leads

Investigation initially focused on Riley Joe Sanders III, but he was eventually eliminated as a suspect. At trial, Sanders testified that Belinda was his content-mastery teacher during the tenth grade. He saw her once a day, every other day. He stated that Belinda came over to talk to his parents that school year, shortly before her murder—he

was present during the conversation when Belinda told his parents how many days of school he had missed. As a result of this conversation, Sanders was grounded, but he insisted that he had no hard feelings toward Belinda. Sanders further confirmed that, on another occasion, Belinda had come to his house to talk to his parents because he and his friends had left beer bottles and beer cans in her back yard. And Sanders also acknowledged that, a couple of weeks before the murder, his friends had messed with some of Belinda and Appellant's Christmas decorations. He testified that he had nothing to do with it, but he was there and made his friends go put the decorations back up.

Sanders testified extensively regarding his activities on the day of the murder. He stated that he went to fifth and sixth periods after lunch, but during seventh period, he and his friend Cody Ellis skipped class and drove to Sanders' house. Then, they smoked a marijuana joint while they drove around. Afterward, Sanders took Ellis home—he estimated that this was around 2:45 p.m. because the buses were leaving the high school at that time. Next, Sanders proceeded to Ryan Bruno's house before returning home around 3:30 p.m. He called his friend Michael Graham to come over, and Graham arrived with Cody Towner. Because Sanders did not have any marijuana in his house, they decided to go down to Randy Hess's house to see if he had any. The three teenagers got into an older white or cream-colored four-door sedan that had paint issues on one of the fenders, and they drove to Hess's home, which was located 20 or 30 houses down from the Sanders home. They talked to Hess for 10 to 15 minutes. He did not have any

marijuana, so they returned to Sanders' house at 4:00 or 4:20 p.m. They then drove to the Quicky Mart to get some cigarettes and returned home once again at 4:30 p.m. At that point, Towner and Graham left, and Sanders grabbed a blanket, changed clothes, and fell asleep on the couch. Sanders awakened when his father got home, and around 6:00 p.m., he came out of the garage and saw the yellow tape being put up near Appellant's home.

Neighbor Michael Ruggiero described Sanders as being "lippy" and stated that he got into fights. On the day after the murder, Michael saw Sanders' father talking to him sternly.

Detective Leithner testified that he spoke with Sanders on three different occasions and that he was cooperative. Leithner stated that the last time he interviewed Sanders was in February 1999. Although Leithner wanted to interview Sanders further, Sanders refused additional interviews. Nonetheless, Leithner explained that he was satisfied "due to other information that was revealed to me."

A warrant for Appellant's arrest was obtained in November 2004. On November 30, Appellant was arrested and subsequently charged with committing the offense of murder.[7] In November 2007, a jury found him guilty and assessed punishment at life imprisonment.

## II. COURT OF APPEALS

On direct appeal, Appellant argued, among other issues, that the evidence was

---

[7]A grand jury took no action in the spring of 1999. A different grand jury returned the instant indictment on February 28, 2005.

insufficient to support his conviction. The Fourteenth Court of Appeals disagreed and affirmed his conviction. *Temple*, 342 S.W.3d at 591. The court summarized its analysis as follows:

> The evidence supports a finding that appellant had motive and opportunity to murder Belinda, lied about the reason he was driving north of I-10 on the afternoon of the murder and about placing [Evan] in a car seat, had a questionable demeanor immediately following Belinda's death, quickly resumed his relationship with Heather following Belinda's death, confronted Quinton and Tammy regarding their statements to police and the grand jury, appellant's house was "staged" to appear as if a burglary had occurred, and appellant and his family were untruthful regarding their shotguns. "While each piece of evidence lacked strength in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom, provide the girders to strengthen the evidence and support a rational jury's finding the elements beyond a reasonable doubt." *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

*Id.*

We granted Appellant's petition for discretionary review to consider the court of appeals's analysis and whether the evidence was sufficient to support Appellant's conviction. Specifically, we granted review of the following issue:

> The Court of Appeals erred in applying this Court's opinion in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) in light of this Court's decision in *Hooper v. State* 214 S.W.3d 9 (Tex. Crim. App. 2007) by improperly drawing inferences of ultimate facts that are unreasonable so as to determine that the evidence was legally sufficient to uphold the jury's verdict.

### III. ARGUMENTS OF THE PARTIES

***Appellant's Arguments***

Appellant argues that the court of appeals misapplied *Brooks* in light of *Hooper* by

improperly drawing unreasonable inferences of ultimate facts in determining that the evidence was legally sufficient to uphold the jury's verdict. He contends that the court of appeals failed to conduct a factual-sufficiency review of the evidence, which is inherent in its legal-sufficiency determination, by (1) failing to review all of the evidence presented to the jury (e.g., the loud noise heard by the Roberts brothers) and (2) drawing improper inferences from select evidence, rather than from all of the evidence.

Appellant maintains that his conviction rests on no evidence that would permit a rational jury to find beyond a reasonable doubt that he intentionally or knowingly caused the death of his wife. Appellant acknowledges that the State presented evidence of possible motive and opportunity, but he emphasizes that those are not elements of the offense and are not sufficient to link him to his wife's death. Moreover, Appellant avers that total deference to the jury's credibility and weight determinations is not required. *Brooks*, 323 S.W.3d at 902 n.19. According to Appellant, there is no affirmative link connecting him to the murder, and the circumstantial evidence to support his conviction is minimal. *Cf. Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007); *Guevara v. State*, 152 S.W.3d 45 (Tex. Crim. App. 2004); *King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000). In addition, Appellant contends that the court of appeals's overall analysis is far too speculative because it is absurd to believe that, during an eighteen-minute period, he could stage a break in, commit murder, dispose of the clothing that he was wearing and the murder weapon, and care for his son.

***State's Arguments***

The State responds that Appellant's argument is urging the Court to reconsider *Brooks* and again create a factual-sufficiency review for criminal cases, which itself would be contrary to *Hooper*. It emphasizes that we should defer to the jury and not become the thirteenth juror. The State maintains that each fact need not point directly and independently to the guilt of the defendant so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The State contends that a rational jury could have found Appellant guilty of the murder of his wife beyond a reasonable doubt. The State argues that Appellant had the best opportunity to kill the victim because Appellant was the last one to see her alive, and that he had motive because he had fallen in love with another woman. The State further avers that the jury could have believed that the burglary had been staged, that Appellant's trip to various locations was either to create a plausible alibi or for a purpose other than merely to run errands, and that, from the nature of Appellant's actions around the time of murder, he was hiding something. Moreover, the State points out that Appellant had a history of gun usage.

## IV. ANALYSIS

A person commits murder if he intentionally or knowingly causes the death of another person or intends to cause serious bodily injury and commits an act clearly

dangerous to human life that causes the death of another. TEX. PENAL CODE § 19.02(b)(1),(2). The issue here is one of identity, that is, whether Appellant killed his wife.

A criminal conviction may be based upon circumstantial evidence. *Clayton*, 235 S.W.3d at 778; *Miller v. State*, 566 S.W.2d 614, 617 (Tex. Crim. App. 1978). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Clayton*, 235 S.W.3d at 778. In circumstantial evidence cases, it is not necessary that every fact and circumstance "point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *see Hooper*, 214 S.W.3d at 13.

As the court of appeals properly noted, this Court now applies only one standard "to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: legal sufficiency." *Temple*, 342 S.W.3d at 583 (citing *Brooks*, 323 S.W.3d 893). Accordingly, when reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19

(1979); *Adames v. State*, 353 S.W.3d 854, 859-60 (Tex. Crim. App. 2011); *Brooks*, 323 S.W.3d at 912.

The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. We permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Id.*; *see Hooper*, 214 S.W.3d at 16-17 (stating that "courts of appeals should . . . determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict"). The jury is not permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 16. When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination. *Jackson*, 443 U.S. at 326.

After a thorough review of the record, and giving proper deference to the jury's verdict, we conclude that the evidence is sufficient to support Appellant's conviction.

Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt. *Clayton*, 235 S.W.3d at 781; *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Harris v. State*, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987). Appellant concedes that the State presented evidence of a possible motive. *Guevara*, 152 S.W.3d at 50 ("Motive is a significant circumstance

indicating guilt."). The jury heard testimony that Appellant was unhappy with his marriage and was having an extra-marital relationship. Several witnesses testified that Appellant made derogatory comments to, and about, his wife and tried to control her. Appellant did not want his wife to come to his high school reunion, where he kissed another woman. In the fall of 1998, Appellant began a three-month sexual relationship with Heather Scott. He spent the weekend of New Year's Eve with Heather but told his wife that he was going hunting. Heather testified that Appellant had fallen in love with her and that she felt the same way. Quinton Harlan testified that, when asked if he would leave Belinda for Heather, Appellant responded, "I don't know."

Evidence also supported Appellant's opportunity to commit the crime. Dr. Dimaio and Dr. Wolfe testified that it was extremely difficult to pinpoint the time of death in this case. Still, the events of the day suggest that Belinda died some time between 3:30 and 5:30 p.m.

Phone records indicated that Belinda made a phone call to her home at 3:32 p.m. Around that time, Belinda picked up some soup from the Temples' residence. Belinda arrived home between 3:45 and 4:00 p.m. It was not until 4:32 p.m. that Appellant was videotaped entering Brookshire Brothers Grocery. Although some witnesses testified that it was about a twelve-minute drive from Appellant's home to the grocery store, it was a distance of only six miles, leaving approximately eighteen to thirty-three minutes during which Appellant's location is unaccounted for. Although Appellant claimed that he took

Evan to Cimmaron Park during that time period, there was no confirmation of his presence there. Investigators returned to Cimmaron Park days later with photographs of Appellant and his truck, and no one recognized them.

Further, evidence revealed that there were several inconsistencies in Appellant's story. For example, when asked by the police to identify the park to which he had taken Evan, Appellant first said Peckham Park but then changed his answer to Cimmaron Park, which was the park in their neighborhood.

Additionally, Appellant was recorded leaving Brookshire Brothers at 4:38 p.m. and entering Home Depot at 5:14 p.m. This is a thirty-six minute gap when it was generally a ten-to-fifteen minute drive. Appellant maintained that the additional time was due to traffic. However, the jury also heard testimony that during this time period, Appellant was seen at the intersection of Morton Ranch Road and Katy Hockley Cutoff, which Appellant denied.

Also, testimony revealed that Appellant arrived back at the house some time between 5:25 and 5:30 p.m. Appellant informed police and testified at trial that, after leaving Brookshire Brothers, he chose not to take Evan to Peckham Park so that he and Evan could return home in time to have dinner with Belinda before she left to play Bunco. However, when he arrived home, he left four-year-old Evan in the garage, alone, to ride his bike. Appellant had originally informed investigators that he had left Evan to ride inside the garage, but he testified that there was not enough space in the garage for that.

Appellant maintained that he simply used poor wording and that he meant that he left the four-year-old to ride his bike in the driveway.

Evidence was also presented supporting the staged nature of the burglary. *See Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008) (discussing evidence supporting the State's argument that the scene was staged). The jury heard testimony that it appeared that the door had been open when the window pane was broken because the majority of the glass was on the floor in the direction of the living room and fireplace, rather than toward the sofa in the foyer as would be expected if the door had been closed. The defense opined that the glass pattern was due to the force of the back door hitting the wooden hutch next to the door, but investigators did not see damage to the hutch or dents on the inside of the door that would be consistent with such.

Aside from the glass evidence, the television was on the ground in the living room with the connections still plugged in, and there was a fresh scratch on the television stand. Although some repairs were subsequently done to the television, officers testified that the television still worked when they turned it on. Additionally, several drawers of the buffet were open, but their contents were undisturbed. In the dining room, the china cabinet was also undisturbed. Belinda's keys were found on the stairs; her purse was found in a downstairs closet, and nothing was missing from it.

Similarly, in the bedroom, the jewelry boxes and jewelry on top of the dressers appeared undisturbed, and Appellant admitted that the burglar "didn't take one single

thing that belonged to [him.]" Also, Belinda was still wearing a watch, a bracelet, a necklace, and rings on both hands when her body was discovered. An insurance claim was submitted for several pieces of missing female jewelry, most of which was identified missing by Appellant's mother, Maureen. But law enforcement officers were not made aware of these missing items by Appellant or his family, instead observing a report of it on television.

Moreover, the location and timing of the alleged burglary was suspicious because Appellant lived on a corner lot, and the burglary allegedly occurred during the day at a time when the neighborhood was busy with people returning home from work and school. Many neighbors testified that they did not see anything unusual around Appellant's home, and they did not hear Shaka, Appellant's loud and aggressive dog, barking. Although the Roberts boys claimed to have heard a sound that they believed was a gunshot at approximately 4:38 p.m., they were the only ones in the neighborhood that reported hearing such a noise, even though many neighbors strolled near Appellant's home at that time.

Testimony also showed that Appellant lacked emotion after discovering that his wife had been shot. At the scene, he did not appear to be upset, and he did not cry. Later, when interviewed, Appellant became irritated and aggressive. He would not look the detectives in the eyes, he would "shake and bounce" in his chair, he was hesitant in his answers, and he still did not cry. Also, a few weeks after Belinda's funeral, Appellant

was asked if he would like to find the murderer, to which he responded, "[W]hat difference is it going to make. It's not going to bring her back."

Additionally, shortly after Belinda's murder, Appellant resumed his relationship with Heather Scott. Just two days after Belinda's murder, Appellant asked Quinton Harlan how Heather was doing, and then, shortly after the funeral, Appellant called Quinton to request that he tell Heather that he was sorry that she had to go through "this." One month after Belinda's death, Appellant sent flowers to Heather on Valentine's Day, and in March, Appellant and Heather began seeing each other again. One of Appellant's neighbors saw Appellant at a steakhouse in September of that year—he was with a woman whose description matched that of Heather. Appellant's family learned that Appellant was dating Heather again about six months after Belinda's death. The couple married in June 2001.

The jury was also presented with testimony that Appellant confronted and threatened Quinton and Tammy Harlan. After they testified before the grand jury, Appellant called the Harlans to ask what they had said to the grand jurors; he warned Quinton to keep his mouth shut. Later, Appellant followed Quinton and Tammy individually to Tammy's place of business. He again advised Quinton to "keep your damn mouth shut." Appellant stopped following Tammy only after she ran inside the business with her gun.

Moreover, the jury heard evidence of Appellant's history of shotgun use.

Appellant and his brothers grew up shooting shotguns in the field behind their home. Although Appellant's family testified that Appellant only used a 20-gauge shotgun, Clint Stockdick testified that he regularly saw Appellant and his brothers use 12-gauge (not 20-gauge) shotguns. Stockdick also stated that the brothers shared their guns with each other and that they would reload their shells. In more recent times, Appellant had discussed guns with Quinton, looked at ads for guns in the newspaper, and talked about possibly obtaining a concealed handgun license. And after the murder, several witnesses testified to seeing a box of shotgun shells in Appellant's possession. Appellant also told Belinda that he was going on a hunting trip with some friends during the weekend of New Year's Eve, although he actually went to Heather Scott's townhouse.

Having viewed the evidence in the light most favorable to the verdict, we hold that the evidence is sufficient to support Appellant's conviction. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 16-17. The jury inferred from the circumstantial evidence that Appellant was guilty of the murder of his wife. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012); *see also id.* at n.21.

Appellant argues that the evidence showing that Riley Joe Sanders, III, had motive, opportunity, and access to a 12-gauge shotgun should have received more weight in the court of appeals's analysis. The pertinent information about Sanders was presented to the

jury, including his activities on the day of the murder and his use of shotguns. Additionally, Sanders himself testified. Appellant had the opportunity to cross-examine him, and the jury was able to assess his credibility. Furthermore, the jury also heard testimony that Sanders was repeatedly questioned and that the law enforcement officers were satisfied by his responses.

It is the province of the jury to assess the credibility and demeanor of the witnesses. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 16-17. We are not the fact finder, and neither was the court of appeals. *Wirth*, 361 S.W.3d at 698 (citing *Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011)); *see Brooks*, 323 S.W.3d at 911-12 (stating that direct-appeal courts are not permitted to act as the "thirteenth juror"). Further, it is not the State's burden to exclude every conceivable alternative to a defendant's guilt. *Laster v. State*, 275 S.W.3d 512, 520-21, 522-23 (Tex. Crim. App. 2009) (reiterating the rejection of the outstanding reasonable hypothesis analytical construct); *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993) (explaining that "the evidence is not rendered insufficient simply because appellant presented a different version of the events").

Therefore, we hold that the evidence was sufficient to support Appellant's conviction for murder. The jury was rationally justified in finding Appellant guilty beyond a reasonable doubt. We affirm the judgment of the court of appeals.

Hervey, J.

Delivered: January 16, 2013
Publish