**AFFIRM; and Opinion Filed August 31, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00127-CR

### CLARENCE DANNEL DUNNINGTON, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80895-2013**

## MEMORANDUM OPINION

Before Chief Justice Wright, Justice Brown, and Justice Stoddart
Opinion by Justice Brown

A jury convicted Clarence Dannel Dunnington of capital murder. The State's theory of guilt was that appellant, acting as a party, participated in the victim's murder in retaliation for her providing information to police that resulted in appellant's arrest. In a single issue, appellant asserts the evidence is legally insufficient to support his conviction. For the following reasons, we affirm.

On December 14, 2011, Jessica Velasquez was shot and killed on a residential street in an old and close-knit neighborhood in Plano, Texas, known as the "Douglas Community." Velasquez was twenty-three years' old at the time of her death. She suffered from bi-polar disorder, had drug problems, and sometimes engaged in prostitution for drugs and money. Appellant was one of the dealers who supplied her. He lived in Wylie, Texas, but had close ties to the Douglas Community, where his grandmother lived, and he was known as "Rabbit."

On December 10, 2011, a few days before she was murdered, Velasquez and her boyfriend Paul Lankfort rented a motel room at a Motel 6. Appellant had also rented a room at the motel and supplied Velasquez drugs throughout the night. The following morning, Detective Jake Wicker was conducting surveillance of the motel. He observed Velasquez exit her motel room, knock on appellant's door a few rooms down, and enter. She emerged about an hour later and returned to the room she shared with Lankfort. Wicker knocked on Velasquez's door and asked her why she had gone to appellant's room. She appeared "high," but denied doing any drugs. But she also told Wicker she had seen drugs in appellant's room. Wicker then knocked on appellant's door, told appellant he had information there were drugs in his room and questioned him about the woman who had just left. Wicker also asked for consent to search. Appellant consented to the search, and police found crack cocaine, a pistol, a ski-mask, two cell phones and $410 in cash. Appellant was arrested and booked into jail.

Two days later, and one day before the murder, appellant was released from jail. He went to the home of Mary Walker who lived in the Douglas Community. Walker testified at trial that appellant was "pissed off," cursed Velasquez, complained that "bitch" got him "arrested," and said when he saw her he was "going to run over her, back up, and run over her again."

The next day, Velasquez got into a car with Octavio Reyna-Rivera, a man she did not know. Reyna-Rivera testified at trial that he agreed to help Velasquez find drugs. Velasquez directed him to Walker's house. Walker was angry with Velasquez for snitching on appellant, but she and her boyfriend Marcus Hernandez agreed to make some calls and find drugs for Velasquez. They used Reyna-Rivera's phone to do so. Phone records show one of the numbers called was to a Nokia phone. The State presented comprehensive evidence showing appellant used that phone to conduct his drug business. For example, evidence showed this was the phone

number Velasquez used to contact appellant during the Motel 6 incident, and it was also the phone number Hernandez told police he used to contact appellant.[1]

Although they called appellant's cell phone, they also called another drug dealer who agreed to bring Velasquez drugs. After the drugs arrived, Velasquez and Reyna-Rivera went to a parking lot where Velasquez smoked the crack. When she was done, she wanted more. In an effort to find more cocaine, she began making calls on Reyna-Rivera's phone. Reyna-Rivera testified Velasquez was not dialing, but just hitting redial, and he could hear only one side of the conversation. Reyna-Rivera's cell phone records show Velasquez was also receiving incoming calls. The phone records show one of those incoming calls came from the Nokia phone appellant used to conduct his drug business, a number Velasquez had not dialed. After speaking on the phone, Velasquez told Reyna-Rivera that she had found someone who would give her drugs for free. Reyna-Rivera took Velasquez to meet this man. He was the last person Velasquez spoke to on Reyna-Rivera's phone.

When they found him, Velasquez did not appear to know the man. Nevertheless, he got into Reyna-Rivera's car. The man told them he did not have the drugs with him, but directed them to where they could get them. When they arrived at the location to get the drugs, the man got out of the car and immediately shot Velasquez several times at close range.

Reyna-Rivera fled into a nearby home. The gunman followed, shooting at Reyna-Rivera and also at the homeowner. After the gunman fled the scene, Reyna-Rivera returned to Velasquez, who was dead. His cell phone was gone.

---

[1] After Velasquez used the Nokia phone number to contact appellant during the night of the Motel 6 incident, he was arrested with two phones, one a Nokia phone, the other his personal LG phone. When he was jailed, he asked his girlfriend, Jessica Cook, to pick up the Nokia phone and deliver it to a known drug dealer. Upon his release, appellant immediately called the Nokia phone from his personal cell phone. Cell tracking information showed the two phones soon thereafter started "traveling together."

Witnesses saw two cars flee the scene after the shooting. One fit the description of Reyna-Rivera's vehicle and the other was a light-colored vehicle with a square back which fit the description of appellant's Ford Fusion.

Almost immediately after the shooting, Velasquez's boyfriend Lankfort received a call from "Shay," another local drug dealer who knew Velasquez. Shay told Lankford Velasquez had been killed for being a snitch. Shay also told Lankford where he could find Velasquez's body. Lankfort then went to the scene, where he told police about Shay's call.

Police discovered that Velasquez, just three days prior, had given police information that led to appellant's arrest. Police had also received anonymous phone tips that "Rabbit" and "Cagan" had been involved in a murder.

The State also provided evidence, through phone records, that showed appellant was in possession of the Nokia phone used by the gunman shortly before the murder. Specifically, about an hour before the murder, texts were exchanged between the Nokia phone and Susan Mounsey, a woman with whom appellant had a sexual relationship, but was otherwise without ties to appellant's associates or the Douglas Community.

The State also presented "cell phone tracking" evidence, specifically evidence from which the location of a cell phone could be determined. That evidence showed that both the phone the gunman used and appellant's personal cell phone were in the vicinity of the murder when it occurred and that both phones then "traveled" to Wylie, Texas, immediately after the murder. The State further showed the Nokia phone was later found in a search of appellant's residence after his arrest for this offense.

After hearing the evidence, the jury was instructed in accordance with the law of parties, and found appellant guilty of capital murder. In his sole issue, appellant contends the evidence is legally insufficient to show he was guilty as a party to Velasquez's murder.

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Temple*, 390 S.W.3d at 360. The jury may draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319.

When analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A jury may draw multiple reasonable inferences as long as each inference is supported by the evidence (direct or circumstantial) presented at trial. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

As applicable to this case, a person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit retaliation. TEX. PEN. CODE ANN. §§ 19.02(b)(1), 19.03(a)(2) (West 2011). A person commits retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for a person providing information to police about an offense. *See* TEX. PEN. CODE ANN. § 36.06(a)(1) (West 2011); *see also Morrow v. State*, 862 S.W.2d 612, 614-15 (Tex. Crim. App. 1993).

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2); *see Patterson v. State*, 950 S.W.2d 196, 202 (Tex. App.—Dallas 1997, pet. ref'd). In reviewing the

sufficiency of evidence under the law of parties, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Id.* Circumstantial evidence alone may be used to prove that a person is a party to an offense. *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987); *Wygal v. State*, 555 S.W.2d 465 (Tex. Crim. App. 1977).

According to appellant, the State failed to prove his guilt because it did not present evidence showing "what actions" he took that amounted to "soliciting, encouraging, directing, aiding or attempting to aid the unknown gunman." But the State is not required to present evidence of the specific acts or statements that constitute participation in an offense. *See, e.g., Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Nelson v. State*, 405 S.W.3d 113, 125-126 (Tex. App.—Houston 2013, pet. ref'd). Instead, the question is whether the jury could reasonably find, beyond a reasonable doubt, based on the collective force of all of the evidence presented, whether appellant was a participant in Velasquez's murder and knew he was assisting in the offense. *Guevara*, 152 S.W.3d at 50. We conclude the State presented sufficient evidence to allow the jury to reasonably make this finding.

Velasquez, who was generally known to be a sweet, but troubled young woman, was murdered just days after she gave police information that led to appellant's arrest. Motive is a significant circumstance indicating guilt. *Guevara*, 152 S.W.3d at 50. Moreover, the day before she was killed, appellant had made threats to harm Velasquez, blaming her for his arrest. On the

–6–

day she was killed, the gunman, using appellant's phone, lured Velasquez with promises of free drugs and then gunned her down.

Cell phone tracking information showed both the Nokia phone used by the gunman and appellant's personal cell phone were in the area where the murder occurred. The cell phone tracking information also showed that immediately after the murder, the cell phones traveled to Wylie, where appellant resided. Further, a car matching the description of appellant's was seen fleeing the scene. Finally, the phone used by the gunman was later found in a search of appellant's bedroom.

Additionally, when appellant heard he was a suspect in this offense, he contacted police in an effort to exonerate himself. He told them he was in Wylie, Texas, with his girlfriend Jessica Cook at the time of the murder. However, cell phone data from his personal phone, an LG phone appellant told police was always with him, showed appellant was not in Wylie at that time. Cell phone evidence also showed appellant was calling and texting Cook from his personal cell phone in this same time period when he claimed to be with Cook. Cook testified at trial, and attempted to provide appellant with an alibi, but she acknowledged that they would not have needed to text or talk on the phone if she and appellant had been together. Attempts to conceal incriminating evidence and giving false statements to authorities are also probative of wrongful conduct and circumstances of guilt. *Id.*

We conclude based on the totality of the evidence, a jury could have reasonably concluded, beyond a reasonable doubt, that appellant was guilty as a party to the murder of Velasquez.  We resolve the sole issue against appellant and affirm his conviction.


/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

140127F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CLARENCE DANNEL DUNNINGTON,
Appellant

No. 05-14-00127-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80895-2013.
Opinion delivered by Justice Brown. Chief
Justice Wright and Justice Stoddart
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 31st day of August, 2015.