WR-78,545-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/28/2015 5:11:08 PM
Accepted 10/29/2015 8:20:17 AM
ABEL ACOSTA
CLERK

**WR-78,540-02**

## IN THE COURT OF CRIMINAL APPEALS

### AUSTIN, TEXAS

| | |
|---|---|
| **EX PARTE** § | |
| § | **From the** |
| § | **178th Judicial District Court** |
| § | **Harris County, Texas** |
| § | **Cause No. 1008763-A** |
| **DAVID MARK TEMPLE,** § | |
| **Applicant** § | |

## APPLICANT'S RESPONSE
## TO RESPONDENT'S/STATE'S OBJECTIONS TO THE
## HABEAS CORPUS FINDINGS OF FACT AND CONCLUSIONS OF LAW

Applicant, DAVID MARK TEMPLE, respectfully requests that the Court of Criminal Appeals consider the following response to the State's objections to the findings of fact and conclusions of law entered by Judge Larry Gist on July 6, 2015.

While there may be factual errors in his findings, such as the relationship between the date of Temple's arrest and indictment, the record is clear that the State intentionally suppressed exculpatory information concerning its investigation of Riley Joe Sanders, Michael Granthom, Cody Towner and Cody Ellis. Further, the State's delayed disclosure of portions of its investigation denied Temple due process and impacted his right to effective assistance of counsel by preventing his

1

attorney from conducting any meaningful investigation of the 1999 Sanders investigation.

## I. OVERVIEW

The State's objections to Judge Gist's findings embrace seven basic themes:

(1) Riley Joe Sanders III was not a suspect in the murder investigation of Belinda Temple's death;

(2) If Sanders was an actual suspect, the State did not have to disclose the details of its investigation of Sanders because Temple and his lawyers, based on neighborhood rumors and Sanders' relationship with Belinda, suspected his involvement in Belinda's murder;

(3) The State satisfied its obligation under *Brady* by partially disclosing the scope of the Sanders investigation during trial. Temple was not harmed by the delayed disclosure because Temple's lawyer attempted to use that information to present a defense without conducting any investigation and having limited access to the investigative materials;

(4) The Defense had access to the offense report even though the file was closed and the State only released a selective portion of the report during trial;

(5) The 12 gauge H&R shotgun recovered by Deputy Ramon Hernandez with a spent reloaded 00 buckshot shell wrapped in a bloodstained towel that had been hidden by Sanders was not material;

(6) The audio statements recorded by Shipley did not contain any material information that had to be produced; and

(7) The fact that a prosecutor mentions the existence of exculpatory information obviates the prosecutor's responsibility to disclose that exculpatory information.

Each of the aforementioned themes the State presents will be addressed below.

## II. RESPONSE

The State has ignored the basic tenets of its responsibility under *Brady* to produce evidence that undermines the State's theory of prosecution and tends to exculpate a defendant, evidence of an alternative suspect investigation, to impeach a witness, and question the validity of the police investigation of a defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). The State has also ignored Ms. Siegler's assertion that a prosecutor does not have to disclose favorable evidence if the prosecutor does not believe the information is true. **7 WR 249-50, 255-57.** In this case, the State has conceded that the essence of the police investigation of Sanders was not disclosed to Temple but that the details of the investigation, which were unknown to Temple and his lawyers, were not material because Temple suspected Sanders as being involved in Belinda Temple's murder.

Judge Gist recognized the fallacy of the State's position by stating that the delayed disclosure of favorable information as well as the suppression of favorable

3

evidence denied Temple's right to due process and impacted his right to effective assistance of counsel. As Judge Gist noted in his findings:

> "Trial counsel's performance was not perfect but much of the difficulty he faced was driven by constant resistance of the trial prosecutor to reveal necessary information. Trial counsel continued to seek helpful information from the prosecutor but little was disclosed prior to trial…it was literally impossible for trial counsel to sufficiently investigate, verify or dispute the disclosures.". ***See Habeas Court's Findings at 7, 25-27.***

It is evident that the trial prosecutor formulated a *brilliantly diabolical plan* to deny Temple a fair trial by espousing the idea that a *Brady* violation does not occur if the defense has knowledge of the identity of an alternative suspect without disclosing the details of the investigation by manipulating the production of evidence that was necessary for trial counsel to effectively represent him. ***See Kelly Siegler's Writ Hearing Testimony 7 WR 57-289 (December 22, 2014); 8 WR** passim **(December 23, 2014); 9 WR** passim **(January 6, 2015); 10 WR** passim **(January 7, 2015); 19 WR** passim **(February 18, 2015).***

**(1) The State alleges throughout these proceedings that Riley Joe Sanders III was not a suspect in the murder investigation of Belinda Temple's death, when in fact he was a highly investigated suspect in the murder of Belinda Temple.**

Throughout these proceedings, Kelly Siegler has maintained that Sanders was never a suspect in the murder investigation of Belinda Temple. She has

repeatedly stated under oath that he was never a suspect in the eyes of law enforcement. **27 WR SX-45 (Affidavit of Kelly Siegler); 10 WR 39-40.** It is clear that she lied.

The investigation of Sanders began when law enforcement learned that he had problems with Belinda and skipped school on January 11, 1999. Between January 11 and February 1, 1999, Sanders was interviewed on six different days, by seven different officers. **12 WR 127-30 (These interviews took place on January 11, 12, 14, 25, 28 and February 1); 29 WR DX-3 Bates 250-52, (Leithner Supplemental Offense Report)** and flunked three polygraph tests that included the question "did you kill Belinda Temple". **DX-85 "1/29/99 Polygraph"; DX-86 (2/5/10 Polygraph) (the report concerning Sanders' third polygraph was either lost or destroyed); 25 TR 5-14, 3 WR 9 lines 10-14; 9 WR 192-194** and had access to a possible murder weapon. **(Report Ramon Hernandez January 13, 1999). 5 WR 76-84; 12 WR 127-30, 169-70, 202-15; 29 WR DX-3 Bates 450; 29 WR DX-3 Bates 460 (Holtke's Offense Report); 26 WR SX-17 "Pasadena Lab Report"; SX-18 (HCSO Supplement Report); SX-19 "HCSO Report"; 30 WR DX-4 (Leithner's Supplement Report).** The H&R shotgun belonging to Sanders' father was recovered with a spent reloaded 00 buckshot shell still in the chamber. **11 WR 34.** This weapon and ammunition was consistent with the same type of ammunition that was used to murder of Belinda

5

Temple.  **11 WR 35.**

In fact, on February 1, 1999, Detective Leithner stated in a report that he told Sanders' parents that he could not be excluded as a possible suspect.  **30 WR DX-4, (Leithner's Supplement Report).**  The investigation continued on February 8, 1999 when Leithner and Schmidt interviewed Sanders' father concerning Belinda letting him know about Riley Joe breaking beer bottles in the back yard.  On February 10, 1999, Ted Wilson, an assistant district attorney, ordered the continued investigation of Sanders. **21 WR 223-24.**  Leithner and Schmidt bought 20 00 buckshot shells to trade with the Sanders 37 reloaded shells to determine if there was any kind of similarity with the wadding recovered at the murder scene.  **29 WR DX-3 Bates 279**.  On February 17, 1999 and February 23, 1999, Schmidt interviewed Natalie Scott twice concerning her knowledge of Belinda's relationship with Sanders.  **29 WR DX-3 Bates 101-02 (Page Offense Report 1/12/99).**

Schmidt, Leithner, Hernandez, Craig Goodheart, one of the trial prosecutors, and Alan Curry, the prosecutor who represented the State on direct appeal, each recognized, after reviewing the offense report,  that Sanders was a suspect as have every appellate court that has reviewed this case. *Temple v. State*, 342 S.W.3d 572 (Tex. App.—Houston [14th Dist.] 2010, pet. granted); *Temple v. State*, 390 S.W.3d 341 (Tex. Crim. App. 2013).  The only person who claims to believe that Sanders

6

was not a suspect is Kelly Siegler.

Clearly, as found by the habeas court, Siegler perpetuated her lie to Judge Harmon on August 25, 2005 concerning the scope or existence of the Sanders investigation. **4 TR 45 lines 20-22; 4 TR 46 lines 3-8**

> "That certainly would be - - once again, this is a two-part request. Obviously any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material. She has a duty to disclose that to you.";

**30 WR DX-18 (Affidavit/Partial Transcript of William Harmon); 4 TR 48 lines 5-8; 4 TR 46 line 20–4 TR 47 line 12.** Her lies continued in her arguments to Judge Shaver, her affidavit presented to Judge Mendoza and in her testimony before Judge Gist.

**(2) The State had a duty to disclose the details of the alternative suspect investigation into Riley Joe Sanders. Whether or not the defense independently suspected or investigated Riley Joe Sanders is irrelevant to their duty if the defense did not have access or knowledge of the information in the State's possession.**

It is uncontested that the defense did not have access to the entire offense report before, during or after the trial as evidence by Ms. Siegler's emails introduced at the habeas hearing instructing lawyers and investigators not to disclose the report to media because the defense never has access to it. **32 WR DX-115.** The State admits that the details of the 1999 investigation of Sanders

7

were not disclosed to the defense prior to trial. **7 WR 204, 241; 9 WR 225**. The State suggests, in a murder prosecution, a prosecutor does not have a duty to disclose the details of a murder investigation of an alternative suspect if the defense independently suspected or investigated that person. The State claims that it did not have a duty under *Brady* or *Kyles* to disclose the details of its investigation because Temple's lawyer investigated Sanders and conveyed neighborhood rumors to law enforcement. *See* **State's Objections at 10 (27a);** *see also* **State's Objections at 21 (50a)**.

The State has clearly misrepresented the law and the record as presented to the habeas court. On February 10, 1999, the Temple family provided the State with a list of rumors that were in the community that outlined Sanders' involvement in the murder. **29 WR DX-3 Bates 951**. Ms. Siegler knew from Kevin Temple's grand jury testimony that was transcribed in March 2005, that the Temple's letter was based on neighborhood rumors. **31 WR DX-83 17.** As evidenced by Paul Looney's testimony and Kevin Temple's 1999 grand jury testimony, Temple was told that Sanders had an alibi and had passed a polygraph test. *Id.* **("That's what the detectives had told us. That he had an alibi"); 4 WR 24 ("He [Wilson] told me that Riley Joe Sanders had an alibi, it had been verified, and there wasn't anything there. I now know that to be a falsehood.")**. In other words, investigators and prosecutors lied to Looney and the

8

Temple family about its investigation of Sanders. Dick DeGuerin relied on those lies.

> "We discussed what Kenneth Temple had tried to tell the District Attorney's Office early on about Riley Joe Sanders and Ms. Siegler said there wasn't anything to it."); ("I believe Kelly Siegler lied to me, but more importantly, lied to Judge Harmon when she denied there were other suspects and when she said that the other guns that had been collected were of the wrong gauge and the wrong type of gun.". **5 WR 115.**

Once Dick DeGuerin entered an appearance as Temple's lawyer, Ms. Siegler created an intentional plan to close her file to the defense. First, after arresting Temple, she did not seek an indictment for almost 90 days. David Temple was arrested on November 30, 2004. **1 CR 3 (Complaint).** DeGuerin appeared as counsel of record on December 3, 2004. **1 CR 5.** She anticipated that Mr. DeGuerin would request an examining trial if no indictment was returned within 90 days after arrest. Immediately after Mr. DeGuerin requested an examining trial, Temple was indicted. **1 CR 17 (2/28/2005 Indictment).** She then invoked "office policy" and closed the State's file. Throughout pretrial proceedings she limited the disclosure of information contained in the offense report. **8 WR 97-101; 31 WR DX-89 (Siegler Subpoena List); 11 WR 26 lines 23-25.** As noted by Matt Hennessy during the August 25, 2005 discovery hearing, Ms. Siegler would often read portions of the files to him as he took notes in her office. **2 TR 35.**

In tendering only those reports for Holtke **30 WR DX-29**, Leitner **30 WR**

9

**DX-31**, Shipley **30 WR DX-32** and Schmidt **30 WR DX-33** during trial, defense counsel was prevented from discovering the complete investigation of each testifying officer. **12 WR 15 lines 16-20.** Bock, Wichkowski, Scudder, Hernandez, Gonzalez and Jones were excluded from Siegler's witness list. Without offense reports or inclusion on a subpoenas list, defense counsel could not have discovered who participated in the investigation prior to trial. **11 WR 84.** Second, she lied to the trial judge concerning the scope of the police investigation. **4 TR 46 line 20–4 TR 47 line 12.** Third, she disclosed the 2004 investigation of Cain on October 4, 2007 to distract trial counsel's trial preparation even though all of the Cain reports were in her possession prior to Temple's arrest. **23 WR 76-77; 32 WR DX-118 (Partial Transcript Between Siegler/DeGuerin); 29 WR DX-3, Bates 348 (Mrs. Cain made her report on November 5, 2004).** Fourth, she refused to disclose information concerning barking dogs and allowed the information to be discovered after the first witness testified even though she was ordered by Judge Shaver to disclose that exact information. **4 TR 46-48 (August 25, 2005, Pretrial Hearing); 9 WR 227-34; 29 WR DX-3 Bates 19; 9 TR 97-102, 115-17; 32 WR DX-117, DX-117A, DX-117B, "Transcripts of Parker Interviews, October 17, 2007".** The prosecutor failed to include information about the Parkers when she was reading the particular offense report containing the information to defense counsel. **26 WR SX-25 (Dick DeGuerin Offense Report**

**Notes).** Fifth, Ms. Siegler controlled the disclosure of the investigation of Sanders by limiting trial counsel's knowledge of the investigation and by presenting a false impression of the Sanders investigation to the jury. Finally, the trial prosecutor alleged during trial that the fact that Temple subpoenaed Sanders' school record proved that Temple knew the details of the police investigation of him even though trial counsel listed some of the facts that he learned after Detective Liethner testified in his motion for continuance. **25 TR 10-11.**

During the habeas hearing, trial counsel stated that he attempted to investigate Sanders but he never knew about any names of other boys investigated by law enforcement or the extent of the investigation of Sanders. **5 WR 124.** He never knew that Granthom and Towner flunked polygraph tests concerning their knowledge of who killed Belinda Temple or that they left Sanders' home at approximately 4:30p.m., and that they were probably the boys seen by the Ruggerios. **26 WR SX-15**. While the Temple family suspected Sanders was involved in Belinda's murder, they never knew that he was an actual suspect of law enforcement. Temple never knew that Sanders was interviewed on six different days by seven officers, gave at least eight oral statements, two written statements and flunked three polygraph tests. Temple never knew the content of any statement of the other boys or that Sanders' father and Natalie Scott gave conflicting statements about Sanders breaking glass bottles in the Temple backyard

11

prior to Belinda Temple's murder.  **5 WR 125-26.**   Temple, at trial, was never ever able to challenge the police investigation of Sanders because of the delayed disclosure and prosecutorial lies.  He learned about Nikki Biondi while reviewing Schmidt's report but never had an opportunity to investigate or present Nikki Biondi's testimony concerning her conversation with Sanders on the day of the murder.

Within their objections to the habeas court's findings, the State has alleged that during trial the State disclosed the reports of Shipley, Wichkowski and Leithner because they testified.  The State has misrepresented the record and the truth.

Wichkowski was called by the defense concerning the investigation of the Roberts boys.  **20 TR 293.**  The State did not produce all of his reports.  The State never produced its report concerning Wichkowski's interview of Sanders Ellis and Towner on January 14, 1999.  **29 WR DX-3 Bates 1765-1771.**  The defense was never informed that the Hernandez and Lampson report concerning their activity on January 28, 1999 was lost destroyed or never written.  **5 WR5 76-84; 12 WR 127-30, 169-70, 202-15; 29 WR DX-3 Bates 459; 29 WR DX-3 Bates 460 (Holtke's Offense Report); 26 WR SX-17 (Pasadena Lab Report); SX-18 (HCSO Supplement Report); SX-19 (HCSO Report); 30 WR DX-4 (Leithner's Supplement Report).**

Thus, the State suggests its constitutional duty to produce facts of its alternative suspect investigation does not exist if a defendant believes that an individual is involved or that neighborhood rumors exists that the individual is involved. But for the discovery post trial, no one would have learned the extent of the investigation. The defense merely knew that Sanders skipped school and Belinda complained to his parents about his behavior.

The State failed to produce its investigation of Sanders, Towner, Granthom, Ellis, Pena and Corro. While the jury heard Sanders testify, the jury did not hear the whole story, which the state had in its possession. The jury did not hear or see the evolution of a story from January 11, 1999 through November 14, 2007. After he testified, Sanders' oral statements were not produced. Trial counsel was allowed to read Shipley and Leithner's reports but was not allowed to keep them. Schmidt's report contains no oral statements of Sanders even though he interviewed him. However, Schmidt's report did contain information that could have been used to impeach Sanders.

Contrary to the State's position, contained in Schmidt's offense report as evidence during his testimony is the fact that Natalie Scott told investigators that she was worried about a student. **29 WR DX-3 Bates 297-98.** Contained within Schmidt's writ testimony, Schmidt stated that Ms. Scott told him that Belinda told

13

her that Sanders was mad at her. **12 WR 144, 165-66.** Schmidt's offense report contains two interviews of Natalie Scott concerning Belinda's conversations with her about Sanders. Those conversations contradicted Sanders' father's interview with law enforcement. Ms. Scott's oral statements were never produced after she testified. Her oral statements were different than her written statements. **29 WR DX-3 Bates 851-53.**

Riley Joe Sanders' story changed over time, and that fact was hid from the jury. Sanders repeatedly lied to law enforcement and he continued to manufacture lies. If all of the statements were produced, trial counsel could have shown how the State manipulated the 1999 grand jury by producing only a portion of the evidence against Sanders. Further, the State asserts that Sanders' written statements were consistent with the oral statements given to law enforcement contained in the offense report. This is not true.

First, Sanders' first written statement was given on January 28, 1999. **5 WR 79-80.** It followed his first oral interview of that date to Lampson and Hernandez. **5 WR 78.** There is no offense report recounting what Lampson and Hernandez heard in that first oral interview. Following the first written statement was the first failed polygraph test. After the first failed polygraph test, Lampson and Hernandez interviewed Sanders a second time. There is no report of the contents of that interview. Sanders then flunked a second polygraph test. The only written account

14

of the events of January 28, 1999 are summarized in Leithner's report. **27 WR DX-3 Bates 1939-40.** What is most important about January 28, 1999 is that Hernandez, while interviewing Cody Ellis and Sanders, recovered an H & R shotgun belonging to Sanders somewhere. **5 WR 81-84.**

Second, there is an important difference between the written statement of Sanders on February 1, 1999 and the oral interview pertaining to the description of Temple's vehicle that Sanders saw leaving the neighborhood. Orally, Sanders states that he saw Temple drive out of the neighborhood. In his written statement, he claims to have seen a vehicle that looked like Temple's.

The statements from February 1st suggest that Temple was leaving his home close to 4:30p.m. which would impact the timeline presented to the jury. That statement is consistent with Charles Temple's statement that places Belinda home after 4:10, rather than earlier. It was exculpatory.

An inherent part of the investigation of Sanders was his relationship to Cody Ellis. A facet presented to the jury was that Sanders drove Ellis home from school after they skipped 7th period. Sanders testified at trial that he got to Ellis' house at 2:50. The offense report indicates Ellis and his father stated that Sanders dropped him off at his house at 3:22. Sanders then stayed at Ellis' house until 3:30 and then he left. Ellis' story about the afternoon is different than Sanders'. Most important, trial counsel did not know Ellis' relationship to the H&R shotgun. Sanders

15

testified that he left the H&R shotgun with Ellis after shooting it without permission. **26 TR 195-200.**

A reasonable deduction from the evidence is that Sanders drove Ellis home on January 11th so that he could get his shotgun. When he got home he left that shotgun out while he Towner and Granthom went searching for more drugs. Randy Hess would not give them any dope and they had no money, but Sanders saw Temple driving out of the neighborhood. **5 WR 100**. A plan was immediately created to break in to Temple's house. The dog was not in the back yard so they took the gun with them. The State opines that because trial counsel was aware that Sanders existed and because he subpoenaed Sanders' school records, that limited knowledge obviated the State's duty to disclose the extensive investigation of Sanders and his friends that occurred in 1999.

Suspicions by lay individuals bears no legal significance in a court of law especially when the lay individuals are informed that their suspicions are unfounded. **31 WR DX-83 17 (Grand Jury Testimony of Kevin Temple) ("That's what the detectives had told us. That he had an alibi")**. What matters are the opinions and suspicions of law enforcement during the course of their investigation.

The State's presentation of evidence during trial was premised on the false impression that law enforcement never investigated Riley Joe Sanders or anyone

else as a possible suspect in the murder of Belinda Temple. The combined effect of suppression of the offense reports pretrial and the presentation of only four detectives that interviewed Sanders during trial did not nearly present the entire story. Rather, these carefully chosen witnesses and efforts to maintain control over exculpatory content within the offense reports throughout trial were a tactic to hide exculpatory evidence. The State in its response misrepresented the trial record by asserting that Detective Wichkowski's interview of Sanders was produced. Wichkowski was a defense witness concerning his interview of the Roberts boys during the defense case in chief. His reports concerning Sanders were never produced.

(3)(a) **The State insists that the Sanders information was partially disclosed at trial for cross-examination.**

The interviews of Riley Joe Sanders from January 12th **29 WR DX-3 Bates 89**, 14th **29 WR DX-3 Bates 77-78, 105**, 25th **29 WR DX-3 Bates 214-17**, 28th **12 WR 127-30**, and 29th **29 WR DX-3 Bates 250-52** were never produced. **5 WR 181 (Jan. 14, 1999), 5 WR 182 (Jan. 25, 1999).** While the reports from January 11th **29 WR DX-3 Bates 51-52**, and February 1st **27 WR DX-3 Bates 1939-40** were produced during trial, they were not produced after Sanders testified. **5 WR 180-83**. None of the statements of Ellis, Towner, Granthom Pena, Hess or Corro were ever produced. **29 WR DX-3 Bates 263-65 (only an oral statement of**

17

**Casey Goosby**), **5 WR 184-85 (Ellis); 5 WR 185 (Granthom**). While it is true that when Shipley testified her interview of Sanders was produced, the statement was then immediately taken back by the prosecutor. ***See* Habeas Court's Findings at 6-7**. The statement was not produced to the defense for use in cross-examination after Sanders testified in the State's Rebuttal case. With all of Sanders' statements, Dick DeGuerin could have shown the jury the scope of the investigation and the evolution of his testimony.

**(b) The State presented a false impression to the jury concerning the extent of the Sanders investigation.**

Through the testimony of Chuck Leithner and Mark Schmidt, Ms. Siegler intentionally created a false impression to the jury concerning the scope and breadth of the Sanders examination and the recovery of the H&R shotgun. An examination of the trial record indicates that Ms. Siegler, through the testimony of Chuck Leithner and Mark Schmidt, created a false impression to the jury of the scope of the Sanders investigation and the recovery of the H&R shotgun with the spent reloaded shell. Riley Joe Sanders was introduced to the jury by Siegler during the direct examination of Detective Liethner. **12 TR 86**. During his testimony, Leithner suggested that Sanders was interviewed two or three times. **12 TR 88.** And, he suggested that the State recovered two shotguns from the Sanders residence**. 12 TR 89.** Leithner even denied obtaining reloaded 00 buckshot shells

18

from the Sanders family. **12 TR 106.**

The State misrepresented the scope of the Sanders investigation during the direct examination of Detective Mark Schmidt. Siegler asked if Schmidt talked to Sanders "around the end of January going into February of '99". **13 TR 36.** Schmidt told the jury that his involvement was limited to going to his home once. He stated that Sergeant Wichkowski and Investigator Hernandez interviewed him. **13 TR 37.**

**(c) Further, Detective Schmidt admitted at the writ hearing that he lied to the jury.**

During the habeas hearing, Detective Schmidt admitted that at the time of trial, he was aware that Shipley interviewed Sanders on January 11th, Gonzalez interviewed him on January 12th, Paige and Wichkowski on the 14th and Hernandez and Lampson on January 25th and 28th. **12 WR 124.** Law enforcement became aware of Sanders on January 13th as someone that needed to be investigated because he skipped school on January 11th and Sanders had problems with Ms. Temple. *Id.*

When Schmidt testified at trial on October 22 and 23, 2007, Schmidt was aware that by January 25th, Sanders had given four different versions of a story to law enforcement. **12 WR 125.** Schmidt informed Leithner that Hernandez interviewed Sanders multiple times on January 28th and he recognized that

19

Hernandez wrote a report about taking Sanders' statements. **12 WR 129.** Schmidt recognized that Cody Ellis was a possible suspect in Belinda Temple's murder based on his hiding of Sanders' shotgun. **12 WR 137.** Leithner told Sanders' parents that he was a possible suspect. **12 WR 138.**

Schmidt also spoke to Sanders' girlfriend Nikki Biondi who told him that Sanders called her around 6:30 and told her that his neighbor had been shot. **12 WR 140.** According to the offense report, law enforcement was not informing anyone what happened to Belinda Temple on January 11, 1999. **12 WR 143.** Schmidt has admitted that his report reflects that Natalie Scott contradicted Sanders' parents' statement. **12 WR 144.**

Schmidt stated that all of the detectives working on the case reported to him. **12 WR 148.** Schmidt also stated that his report did not reflect everything that he did during the investigation. Mr. DeGuerin would not have known to ask him questions about things he did that were included only in someone else's report. **12 WR 154.** Schmidt recognized the conflict between Sanders' father's statement about Belinda's complaints and statements made to Natalie Scott. **12 WR 166.** Schmidt also admitted that no one investigated where the Sanders family's H&R shotgun was on January 11th. **12 WR 129-30.**

From January 11th through March 1999, two people were investigated: Riley Joe Sanders and David Temple. Schmidt admitted that a grand juror labeled

Sanders a possible suspect. **12 WR 186**. Sanders was an alternative suspect along with Ellis, Towner and Granthom. **12 WR 193.** Schmidt admitted that in order to understand Sanders' involvement one would have to look at the statements of Ellis, Towner, Grantom, Corro and Pena. **12 WR 195.**

Schmidt also admitted that Ms. Siegler's questioning concerning Schmidt's involvement in talking to Sanders in late January or February was not accurate. **12 WR 202**, and that his testimony was not true concerning his own involvement with the Sanders family. **12 WR 207.** He made another error in his testimony when he stated that he recovered two shotguns at the Sanders home on February 1, 1999. **12 WR 212.** Schmidt stated that Ms. Siegler's questioning created a false impression concerning the recovery of the shotguns. **12 WR 214.**

Further, by not addressing findings 4, 6, 8, 11, 12, 13, 17, the State is conceding the accuracy of those findings. Most importantly, the State has conceded that Ms. Siegler lied to the trial court on August 25, 2005 as found in finding 4 when she stated that there were no alternative suspects investigated by law enforcement in 1999.

The most important fact noted by the habeas court was that trial counsel could not investigate Sanders, Towner, Granthom, Ellis, Corro and Goosby and their relationship. *See* **Habeas Court's Exculpatory Evidence Finding Number 8.** Trial counsel did not know their relationships and their relationship to the

21

Heatherington retaliation burglary committed by Goosby, Corro and Ellis on January 2, 1999. The habeas record is clear that the original offense report obtained by Mr. DeGuerin listed Goosby and Jonathon Pena as suspects. The Harris County Sheriff's offense report thoroughly investigated that burglary but failed to disclose the details of it to the defense even though it occurred in Fort Bend County. The facts surrounding the Heatherington burglary illustrate the relationship between Sanders Ellis and Corro.

Riley Joe Sanders took the H&R shotgun and reloaded shotgun shells from his house to shoot with Ellis and Corro as they wanted to fire the shotguns they stole. They each lied about the burglary to some extent. Sanders lied to his parents and hid the shotgun with Ellis. He skipped school with Ellis on January 11, 1999. It is reasonable to assume that Sanders drove Ellis home on January 11th to retrieve the shotgun. Yet, it remained hidden until it was recovered on January 28, 1999 by Deputy Ramon Hernandez.

Mr. DeGuerin had no opportunity to investigate the Ellis/Sanders relationship or Ellis' conflicting statements. The Ellis/Sanders relationship has to be examined in terms of the story and lies told on January 14, 1999 to Hernandez, the contents of which were never produced. The story includes the complete investigation of Sanders, Ellis, Towner, Granthom, Corrro, Pena and Goosby. Discovered during the habeas hearing was the printout of other burglaries

22

investigated by the Sheriff's department in the neighborhood.

Siegler's scheme is evident. She believed that when she lied to a judge her lies would be believed. The perfect example is the lie told to Judge William Harmon on August 25, 2005. She lied to Judge Shaver on October 4, 2007. She told Judges Harmon and Shaver that weapons recovered in 1999 were the wrong type of ammunition and the wrong type of weapons. **4 TR 54 lines 20-23.** During the habeas hearing, she explained that she misspoke in mentioning the wrong type of weapons even though she used the phrase in two different hearings; one in 2005 and the other in 2007. **7 WR 231.**

This Court can observe Kelly Siegler's plan pretrial by the following uncontested facts:

1. She closed the state file consisting of over 1300 pages;

2. She told the trial court that there were no alternative suspects on August 25, 2005;

3. She told the Court on August 25, 2005, that the wrong types of weapons and the wrong type of ammunition were recovered during the 1999 investigation;

4. On October 4, 2007, she disclosed an investigation of Cain that occurred in 2004 as an alternative suspect;

5. On October 4, 2007 she told Judge Shaver that the wrong type of weapons and the wrong type of ammunition were recovered during the 1999 investigation;

6. She disobeyed a court order to disclose any information regarding a barking dog given by Judge Shaver;

7. She lied to Judge Shaver about the phone number to the Roberts being disconnected;

8. She created a false impression before the jury concerning the extent of the investigation of Sanders by allowing Detective Schmidt to lie as he admitted during the writ hearing; and

8. She lied in her affidavit submitted to Judge Mendoza where in she stated that none of the investigators considered Sanders a suspect during the initial investigation of Belinda Temple's murder.

**(4) The State's assertion that trial counsel could have had access to parts of the offense report is a gross misrepresentation of the record.**

On August 25, 2005, the State informed the trial court that the file was closed. **4 TR** *passim***.** The State agreed that it read only portions of the record to defense counsel. **26 WR SX-25 (Dick DeGuerin Offense Report Notes).** Any assertion to the contrary is not true. An important consideration is that the totality of the offense report must be viewed as one and not independent facts in order for the contents to be of any practical value to the defendant.

**(5) The 12 gauge H&R shotgun recovered by Deputy Ramon Hernandez with a spent reloaded 00 buckshot shell wrapped in bloodstained towel that**

**had been hidden by Sanders was material and should have been disclosed.**

Judge Gist found that the fact the report by Deputy Hernandez concerning recovery of the H & R shotgun was lost, destroyed or never prepared, showing how where and from whom the weapon was obtained was exculpatory evidence. *See* **Habeas Court's Exculpatory Evidence Finding 1.**

When asked about the recovery of weapons during the 1999 investigation Kelly Siegler told both Judge Harmon and Judge Shaver that the wrong type of weapons and wrong type of ammunition were recovered. **4 TR 54 lines 20-23.** Mr. DeGuerin repeatedly asked where the shotguns were recovered. In its response, the State omits all of the information contained in the offense report that was presented and discussed during the habeas hearing.

The trial record reflects that Belinda Temple was murdered with a reloaded 00 buckshot shell. The only weapon recovered in 1999 that fit the characteristics of the murder weapon was Sanders' H&R 12 gauge shotgun. The State intentionally misled the jury by suggesting that the weapon was recovered by Schmidt and Leithner at Sanders' home on February 1, 1999. **13 TR 39.** The jury never heard the truth concerning the Heatherington burglary and its relationship to the Temple burglary.

While it is true that trial counsel had a copy of the original offense report concerning the Heatherington burglary, trial counsel never had the complete report.

Trial counsel did not learn that Cody Ellis, Carlos Corro, Jonathon Pena and Riley Joe Sanders went shooting prior to the murder. Trial counsel never learned that Cody Ellis hid Sanders' shotgun prior to January 11th. Trial counsel never learned that Sanders hid the shotgun from January 11th through January 28th. The crucial fact that was not presented to the jury was that Sanders hid his usage of the shotgun from his father. The 12-gauge shotgun Riley Joe Sanders hid in the month following Belinda Temple's murder is not the "wrong type of weapon" nor is it the "wrong type of ammunition" as the prosecutor represented to multiple judges throughout this case.

In reality, the H&R shotgun was consistent with the same type of ammunition that was used to murder Belinda Temple. **11 WR 35.** Ramon Hernandez recovered the shotgun the same day he interviewed Cody Ellis and Riley Joe Sanders. Ramon Hernandez recovered the shotgun the same day that Sanders flunked two polygraph tests and gave two oral statements that were never produced. While the wadding in the recovered reloaded shells from Sanders home did not match the wadding recovered from the scene, the wadding in each shell were not all the same. **12 WR 193**. During the defense case, the defense re called Detective Holtke to discuss the recovery of the shotgun, but there was no coherent story presented. But the defense never knew the whole story of the shotgun.

The facts are clear that only Riley Joe Sanders had access to a 12-gauge

26

shotgun and reloaded shells that were consistent with the murder weapon. Only Riley Joe Sanders hid a shotgun from scrutiny. Only Riley Joe Sanders' shotgun was recovered without anyone being able to determine where it was recovered. Pena and Corro told police that Sanders' shotgun was hidden. The act of hiding the shotgun is an inculpatory fact considering the type of weapon and ammunition recovered in it.

**(6) The audio statements recorded by Shipley did not contain any material information that had to be produced;**

The habeas court found that Ms. Siegler lied concerning her knowledge of recorded statements of witnesses during the 1999 investigation. **15 TR 159-183; 23 WR 16-17.** The State did not disclose the statement of Stacy Nissley who reported that Belinda believed the boy next door was dangerous. **23 WR 25**; **10 WR 107-111; 35 WR DX-179 (Siegler's Handwritten List of Recorded Interviews); 35 WR DX-180 (Audiotape) (Media filed as DEFENSE.EXHIBIT.180.mp3).** During the writ hearing, the State represented to the court there were no other audio tapes in the states possession. **10 WR 111 lines 10-15.** Open records production revealed Alan Curry had created an inventory of the 11 boxes containing the State's file on Temple entitled "File Summary." **33 WR DX-129 43 (September 5, 2012, Curry email to his home address).** Within that document was an entry "Manila folder labeled "Taped WS's

27

by Lampson / Shipley," containing One sheet of paper Two cassette recordings."
On July 11, 2012, Curry forwarded that summary to Richard Holland. **33 WR DX-129, 234.** On July 30, 2012, Andrew Smith emailed Curry so "the writs division could take over possession of the file." **33 WR DX-129, 70 (July 29, 2013, Email from Smith to Curry).** Mr. Smith told the habeas court that there were no audiotapes in the State's file before the Shipley tapes were discovered in the middle of the hearing. **10 WR 111 lines 10-15.**

When asked if there were any recorded statements of witnesses the trial prosecutor lied and said there were none. **10 WR 107-11**. Margaret Christen stated that the Assistant principal walked out of school with Belinda and she was talking to David on the phone. **23 WR 19 lines 14-19 (reporting that she'd talked to Stacy Ferguson and Denise Lavoris about them seeing Belinda Temple in the parking lot after school on the phone with David).** That audio recording was not produced at trial. She stated that her meeting with Belinda ended between 3:20 and 3:30. A significant factor for the time line was the evidence at trial concerning a 3:32 phone call from Belinda to David. **23 WR 20-23**. That phone call was proven at trial by the introduction of phone records through Detective Schmidt. **12 TR 205-07;** *see also* **SX-152**. The State argued that no one knew where Belinda was when that phone call was made. Margaret Christen identified a person who overheard that phone call and saw Belinda on the

phone. **23 WR 19 lines 14-19 (reporting that she'd talked to Stacy Ferguson and Denise Lavoris about them seeing Belinda Temple in the parking lot after school on the phone with David).** A witness could have placed Belinda at the school at 3:32. **35 WR DX-179 (Recorded Interview of Margaret Christen 4:10-4:25).** That information is exculpatory was intentionally suppressed by the State.

The State's rationale is disingenuous. While Judge Gist's finding may not be factually accurate as to what Margaret Christen's statement says, he got it right that it was exculpatory and important for the time line. **15 TR 159-183; 23 WR 16-17.** Margaret Christen tells police about a phone call made after her meeting as Belinda was leaving school. **35 WR DX-179 (Recorded Interview of Margaret Christen 4:10-4:25).** That would place Belinda in the school parking lot, according to her phone record. If Belinda was in the school parking lot at 3:32, she could not have gotten home by 3:45 as argued by Ms. Siegler. The State's timeline would have been wrong. It would have been impossible for Belinda to have gotten home before 4:10 p.m. More importantly the fact of her being in the parking lot at 3:32 proves the accuracy of Charles Temple's original statement to law enforcement that she arrived at his house at 3:45 and left at 3:55, which was never presented to the jury even though Mr. DeGuerin had it in his possession.

**(6) The Fact that a prosecutor mentions the existence of exculpatory**

29

**information obviates the prosecutor's responsibility to disclose that exculpatory information.**

The fact that Ms. Siegler told defense counsel the FBI profile report existed in a phone conversation prior to indictment does not vitiate her duty to disclose it. **22 WR 23 (Dick DeGuerin's Testimony) & SX-34 (Kelly Siegler and Dick DeGuerin 2/23/2005 Conversation).** According to the State, trial counsel was told about the FBI report prior to indictment. After indictment it was never produced to the defense. **12 WR 224-29 (Testimony of Det. Schmidt); 30 WR DX-5 (FBI Report); 23 WR 78 ("I don't remember seeing it" – Dick DeGuerin).** The trial prosecutor admitted that she did not produce it. The fact that trial counsel was informed that a report by an expert existed is inherently different from the act of production. Trial counsel could have used the report to effectively cross-examine many witnesses to establish that Sanders was a more likely suspect than Temple. **12 WR 224-29; 5 WR 203.** The record is clear. The State carefully crafted what information it would produce, and what information it would actively conceal.

While profile evidence might not be admissible, the information in the report could have been used to establish the basis for an investigation of Sanders and in cross examination of police witnesses to challenge the accuracy and reliability of the investigation. **12 WR 225; 11 WR 157-58.** Clearly, inherent with Brady, the

manner in which law enforcement investigate a person accused and an alternative suspect are relevant and crucial for a jury to understand that investigators wore blinders in their attempts to ignore Sanders and concentrate on Temple.

Mentioning the existence of information is no substitute for the production which is required by the Constitution.

Respectfully submitted,

/s/ STANLEY G. SCHNEIDER
STANLEY G. SCHNEIDER
Schneider & McKinney, P.C.
Texas Bar No: 17790500
440 Louisiana, Suite 800
Houston, Texas 77002
Office: (713) 951-9994
Fax: (713) 224-6008
Email: stans3112@aol.com

CASIE LYNN GOTRO
Texas Bar No. 24048505
440 Louisiana, Suite 800
Houston, Texas 77002
Tel: (713) 228-2737
Fax: (832) 201-8273
Email: casie.gotro@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been emailed, mailed and/or hand delivered to the office of the Harris County District Attorney's Office, Attn: Post Conviction Writs, 1201 Franklin, Houston, Texas 77002, on this the 28th day of October, 2015.

/s/ STANLEY G. SCHNEIDER
STANLEY G. SCHNEIDER