# NO. 12-15-00003-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DEQUISHA JACKSON,* <br> *APPELLANT* | § | *APPEAL FROM THE 159TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* <br> *APPELLEE* | § | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Appellant, Dequisha Jackson, appeals her conviction for manslaughter in the death of her infant child. In one issue, she contends the evidence is insufficient to support her conviction. We affirm.

## BACKGROUND

On August 13, 2013, Appellant gave birth to a healthy six pound seven ounce baby boy, I'Mauri Jackson. On her discharge from Methodist Hospital in Baytown, Texas, she received instructions from the hospital stating that she was to bring the baby in for a follow up visit with a doctor three days after I'Mauri's discharge. An appointment was made for I'Mauri for August 19, 2013. Appellant did not keep the appointment. I'Mauri was never again seen by a physician until shortly after his death on October 11, 2013.

On August 28, 2013, two weeks after I'Mauri's birth, Appellant moved in with her aunt, Linda Bankhead. Isaiah Tolliver, who thought he was probably I'Mauri's father, moved in with Appellant at Bankhead's home at 1506 Williams Street, Lufkin, Texas.

On October 11, 2013, Desmond Garcia, a paramedic with the City of Lufkin, responded to a report of an infant not breathing at 1506 Williams Street. Upon entering the house, Garcia found I'Mauri lying on his back on the bedroom floor, in cardiac arrest, blue and cold and stiff.

1

Garcia was there for only two or three minutes, but he noted the parents did not exhibit the anxiety or distress typical of most parents in similar situations. In his opinion, they did not act as if I'Mauri's condition was an emergency.

The trip to the hospital emergency room took ten to twelve minutes. On arrival, the baby had no cardiac electrical activity, no pulse, and no respiratory effort. The medical team observed that I'Mauri was extremely emaciated and dehydrated. There were several signs that rigor mortis had set in, which indicated he had probably died before the paramedics were called. I'Mauri weighed five pounds and six ounces. Given his length, I'Mauri should have weighed nine pounds eight ounces.

An autopsy showed that I'Mauri was extremely emaciated and dehydrated. His body fat was almost depleted. His eyes were sunken and his fontanel was sunken, indicating dehydration. There was no evidence of congenital abnormality disease or genetic disorders. Toxicology tests for poisons, drugs, and medications found none. I'Mauri's liver showed signs of malnutrition or inappropriate caloric intake. The presence of fluid in his eyes also indicated dehydration. It was the pathologist's opinion that I'Mauri died of dehydration and malnutrition.

Jarod Hennigan, a patrol officer with the Lufkin Police Department, was one of the first officers to arrive on the scene. Accompanied by Debra Walsh, a crime scene technician, Officer Hennigan walked through the house. In the room where the baby stayed, they found no baby bottles or toys, no used diapers, and no supply of diapers. In the closet, Officer Hennigan found one clean diaper and some diaper wipes. There were five cans of formula on top of the refrigerator, as well as some cereal. They found no other formula in the house.

Both parents told Lufkin Police Detective Nick Malone that the baby had seen a doctor, but did not provide a doctor's name or the location of the visit. However, no doctor's offices that accept Medicaid patients had any record of I'Mauri. The record shows that before I'Mauri was born, Appellant had received unspecified benefits under the WIC (Women, Infants, and Children) program. Under this program, the cost of formula and diapers would have been covered had Appellant applied for benefits. Appellant was also covered by Medicaid, and therefore I'Mauri was covered.

A jury found Appellant guilty of manslaughter and assessed her punishment at imprisonment for fifteen years and a $10,000 fine. The same jury found Tolliver guilty of child

endangerment and assessed his punishment at confinement for two years in a state jail and a $200 fine.

**SUFFICIENCY OF THE EVIDENCE**

In her sole issue, Appellant contends the evidence is insufficient to support her conviction. She admits that her conduct was negligent, but not reckless. She argues that the evidence pertaining to the actions of her co-defendant, Tolliver, was not substantially any different and does not support the disparity in the jury's verdicts.

**Standard of Review and Applicable Law**

In reviewing the sufficiency of the evidence to support a conviction, the appellate court considers the evidence in the light most favorable to the verdict to determine whether the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

A person commits the offense of manslaughter if she recklessly causes the death of an individual. TEX. PENAL CODE ANN. § 19.04(a) (West 2011).

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c) (West 2011).

The State alleged, in its indictment, that Appellant acted recklessly or was reckless in providing inadequate nutrition or fluids or medical care. The evidence is sufficient to support the verdict if it is sufficient to support any one of the reckless acts alleged. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

Proof of a culpable mental state generally relies on circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978). In considering the sufficiency of the proof of reckless conduct, the issue is "whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk." *Id*. at 95.

3

**Discussion**

The jury saw the heartrending pictures of I'Mauri's shriveled body taken in the emergency room. The pathologist who performed the autopsy testified that he was shocked at his condition. Dr. Melissa Handley, the pediatrician who saw I'Mauri upon his arrival in the emergency room, said that, in her years of practice, she had never seen a child or infant so emaciated. Officer Malone testified that he had "never seen anything like it."

The evidence shows that I'Mauri's condition did not develop suddenly. Although he was healthy and normal at birth, his stunted condition attracted attention upon his arrival at Bankhead's house in Lufkin. Although testifying for the defense, Bankhead admitted that she had been concerned about I'Mauri's condition and that she tried to convince Appellant to get help from WIC and to take him to a doctor. On the day I'Mauri died, she said, "I told them they need to get the baby. . . . I told them something was wrong with the baby. The baby needed to be checked out."

Appellant did not keep the doctor's appointment made for I'Mauri after his birth, and apparently paid no heed to the discharge instructions given regarding his care and feeding. Dr. Handley testified that, by day four, a healthy baby should soil six to eight diapers a day. If the number dropped below five, the baby should be taken to the medical provider. Only one clean and one dirty diaper were discovered when the police searched the Bankhead house immediately after I'Mauri died. Bankhead testified that Appellant prepared formula for the baby, but could not remember if she had actually seen her do this.

While in the Angelina County jail, Appellant told fellow inmate Misti Davis that she wanted to stay up with her boyfriend at night and that she slept during the day. She admitted that when the baby fussed and cried, she would just put a pacifier in his mouth rather than feeding him. Night care and feeding were delegated to a fifteen year old cousin. Appellant admitted she had never taken I'Mauri to a doctor.

In a letter Appellant wrote to I'Mauri's father, she said she was "so sorry I ask you to move out here and messed up you life. And maybe you shouldn't be with me even though I did do what they trying to say I did. Just because of me you in jail and I am sorry[.]" However, in another letter to Tolliver she wrote, "I know that we didn't do anything to hurt our baby. Our baby had food and everything." These letters demonstrate that Appellant is functionally literate and therefore able to read and understand the instructions given her when the baby was born.

4

The first letter also exhibits Appellant's remorse, not for her conduct resulting in the death of her baby, but for having placed the father in a position to be prosecuted.

The evidence against Tolliver was much less compelling. When Appellant and I'Mauri left the hospital in Baytown, it was she, not Tolliver, who received the discharge instructions on caring for I'Mauri and scheduling a doctor's appointment three days later. She did not follow the instructions. She did not take I'Mauri to the doctor, but she told Tolliver and others that he had been seen by a physician.

Tolliver did not see I'Mauri until he was two weeks old. For a month thereafter, Tolliver was out most of the day looking for a job. For the last week of I'Mauri's life, Tolliver worked at Pilgrim's Pride. Appellant, on the other hand, was at home all day and night with I'Mauri. She had no employment or other duties that might have interfered with her care of I'Mauri. It was Appellant who admitted that when the baby whimpered and cried, she would just put a pacifier in his mouth rather than feed him. It is reasonable to infer from Appellant's letter of apology to Tolliver that she herself recognized her greater culpability for I'Mauri's death.

Viewing the evidence in the light most favorable to the verdict, it was reasonable for the jury to infer from all of the circumstances that Appellant was "aware of but consciously disregarded a substantial and unjustifiable risk" that I'Mauri's death would result, and that her conduct was reckless. The evidence is sufficient to support the verdict. Appellant's sole issue is overruled.

## DISPOSITION

Having overruled Appellant's sole issue, we *affirm* the judgment of the trial court.

BILL BASS
Justice

Opinion delivered April 13, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 13, 2016**

**NO. 12-15-00003-CR**

**DEQUISHA JACKSON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 159th District Court
of Angelina County, Texas (Tr.Ct.No. 2013-0731)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Bill Bass, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*