**Affirmed and Opinion filed April 23, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00119-CR
## NO. 14-19-00120-CR

---

## CHRISTOPHER MICHAEL DUPUY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause Nos. 15-CR-1660 & 15-CR-1661**

---

## OPINION

In this appeal from two convictions for online impersonation, appellant complains in several issues that the evidence is legally insufficient, that the trial court abused its discretion by denying a motion for mistrial and by admitting certain evidence, and that the statute defining the offense is unconstitutional. For the reasons explained below, we overrule each of these issues and affirm the trial court's judgments.

# BACKGROUND

This case is about two women who were falsely advertised as prostitutes without their knowledge or consent.

The first woman is named Amy, and she was startled one evening when she received dozens of unsolicited text messages and phone calls within a short span of twenty minutes. The text messages complimented Amy on her beauty, and inquired about her "overnight" services. Amy mostly ignored the communications, all of which were from unfamiliar numbers, until she decided to answer one of the phone calls. When Amy asked the caller why he was contacting her, the caller responded that her information had been posted to Backpage.com, a now defunct website that was primarily used for prostitution and other illegal activities before it was shut down by the government.

Amy had never heard of Backpage.com, but with the assistance of the caller, she navigated the website and found the advertisement that contained her contact information. The advertisement was entitled "Looking for a sexy nurse?" Within the body of the advertisement, there were three pictures of Amy, all from her Facebook account, including one that showed her in a Halloween costume as a nurse.

Beneath the pictures, the advertisement contained the following text:

All donations are for time and companionship only. Anything else that may occur is between two consenting adults. By contacting me you agree that you are not affiliated with any form of law enforcement.

First time trying this. I am sweet and discreet . . . a total blast. Whatever makes you happy, I certainly adore and will accommodate.

VERY FETISH FRIENDLY and drama-free.

I guarantee you an extraordinary time and full satisfaction, sure to knock your socks off. PICS are 100% ME and RECENT or it's on the house.

70hh/140hr/overnight SPECIALS

The bottom of the advertisement listed Amy's name, phone number, and the neighborhood where she lived.

Amy was in disbelief when she saw the advertisement. She quickly changed her phone number and then contacted the police. When she was asked to identify a possible suspect, the only person who came to mind was appellant.

Amy explained that she and appellant had known each other for twenty years. They dated when they were in college, but then they went their separate ways. Amy eventually married someone else, and when that marriage began to falter, she reached out to appellant, whom she knew to be a lawyer, and asked appellant to assist in the divorce.

While the divorce was pending, and when Amy was still separated from her husband, she and appellant rekindled their earlier passions and became romantic paramours. They had sex several times, but Amy did not consider the relationship to be much more than a friendship. Appellant had other feelings though, and when he learned that Amy had spent a night out with another man, appellant sent Amy a series of "hateful" text messages and threatened to end their attorney-client relationship.

Appellant ultimately completed his legal representation in the divorce. The advertisement on Backpage.com appeared less than a month after the divorce was finalized.

The officer assigned to Amy's case subpoenaed Backpage.com to obtain more information about the advertisement. The business records that were returned to the officer revealed that the person who created Amy's advertisement had also created a second advertisement on the same day.

The headline for the second advertisement was "Clear Lake MILF," which is an explicit acronym for "mom I'd like to f***." Three pictures were associated with this advertisement. The first two were face pictures of a woman named Courtney. The third was a nude picture of Courtney's breasts, and superimposed on her breasts were large dollar symbols.

The text of Courtney's advertisement was similar to Amy's advertisement. Beneath the pictures, the text read as follows:

> All donations are for time and companionship only. Anything else that may occur is between consenting adults. By contacting me you agree that you are not affiliated with any form of law enforcement.
>
> Hi there! My name is Courtney.
>
> I am a classy MILF who wants to fulfill all your needs! Nice, always clean place. Will consider pot for discounts. Everything is negotiable in life so just ask. I am also glad to see you and you will leave very satisfied. . . .
>
> Pictures are 100% Me
>
> 50hh 100hr 300all night

The rest of the advertisement contained Courtney's name, phone number, and the neighborhood where she lived.

The officer tracked down Courtney and discovered that she had changed her phone number shortly before the advertisement was posted, which meant that she did not learn of the advertisement until the officer's outreach. Like Amy, Courtney had never heard of Backpage.com, and she immediately suspected that appellant was responsible for the advertisement.

Courtney explained that she had dated appellant several months earlier, and that their relationship had ended on terms that were "not great." She also said that she had texted the nude picture to appellant when they had been dating, though without the superimposed dollar symbols.

4

The business records from Backpage.com did not implicate appellant by name. Instead, the records reflected that both advertisements were created by a person calling himself "Don Tequila." The records further contained this person's email address, his IP address, and the credit card number that he used to purchase the advertisements.

The officer traced the IP address to an internet network in Venezuela. But after juxtaposing the remoteness of that network with the narrowness of the regional advertisements, the officer came to suspect that the person who created the advertisements had actually been using a virtual private network (or "VPN"), which is an encryption tool that can mask an internet user's true location.

The officer also traced the credit card number to a type of prepaid account that can be activated in stores, without any form of personal registration. This information signified to the officer that the person who created the advertisements was consciously attempting to protect his anonymity.

But when the officer conducted an online search for Don Tequila, he found a close connection to appellant. The officer's search led to a Facebook account for an individual who had taken the name Don Tequila as an alias. The individual used this alias to promote negative news articles about appellant, who had achieved some local notoriety.

The officer found another connection to appellant with the email address that was used to create the advertisements. Records from the email provider indicated that the email account was created on the same day as the advertisements, but from an IP address in Germany, which was another clue that a VPN had been used. Additional records from the email provider showed that the email account was accessed a week after the advertisements were created, and the IP address associated

with that access belonged to a Comcast network in the United States. Records from Comcast showed that the registered owner of that IP address was appellant.

Armed with this information, the officer obtained a warrant to search appellant's residence. Inside the residence, the officer found packaging for the same type of prepaid credit card that was used to purchase the two advertisements. The officer also found multiple electronic devices, which were seized. A forensic analysis of those devices showed that appellant possessed versions of the same pictures that were attached to the advertisements, and that appellant had visited Backpage.com before the advertisements were created. The forensic analysis further revealed that, when the advertisements were created, appellant had visited Hidemyass.com, a website that provides easy access to a VPN.

Based on the foregoing, appellant was indicted on two separate charges of online impersonation (one for impersonating Amy, the other for impersonating Courtney). Appellant pleaded not guilty to both charges. He did not testify at his trial, but his defense counsel suggested that the advertisements were orchestrated by the followers of Don Tequila, who must have exploited appellant's Wi-Fi connection. The jury rejected this defensive theory and convicted appellant on both charges.

## SUFFICIENCY OF THE EVIDENCE

In a sufficiency challenge, a reviewing court must determine whether a rational trier of fact could have found the essential elements of an offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). There were two offenses here, but they were both for online impersonation, which meant that the prosecution had the burden of proving the following essential elements: (1) appellant used the names or personas of Amy and Courtney to create web pages on a commercial social networking site or other internet website;

6

(2) without obtaining their consent; and (3) with the intent to harm, defraud, intimidate, or threaten any person. *See* Tex. Penal Code § 33.07(a)(1). In deciding whether the prosecution satisfied this burden, we consider all of the evidence in the light most favorable to the verdict. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

There was clear and direct evidence of impersonation in this case. Both Amy and Courtney testified that their names and pictures were used to create web pages on Backpage.com, which is an internet website. They also testified that a third party created these web pages without their knowledge or consent.

The main issue at trial was whether appellant was this third party, and as to that element of identity, there was an abundance of circumstantial evidence showing that he was. The business records from Backpage.com established that both advertisements were created by the same person using a single email address. And the business records from other entities established that this email address was accessed from an IP address that was assigned to appellant.

There was evidence that multiple IP addresses had been used in the commission of these offenses, but the jury could have reasonably inferred that appellant had used a VPN on the day that he created the advertisements, which would explain why some of those IP addresses were traced to foreign networks. This inference is supported by the forensic evidence, which showed that appellant had visited Hidemyass.com, a VPN provider. The jury could have likewise inferred that appellant had neglected to use a VPN when he accessed his email account several days later, which would explain why one of the IP addresses was traced specifically to him.

Other circumstantial evidence of identity included appellant's possession of the same type of prepaid credit card that was used to purchase the advertisements.

He also possessed versions of the pictures that were used in those advertisements, and there was forensic evidence showing that he had a history of searching Backpage.com.

Finally, the evidence showed that appellant was the common bond between Amy and Courtney, who did not know each other. Their testimony established that they each had prior romantic relationships with appellant that ended in moments that were "hateful" and "not great." From that testimony, the jury could have reasonably inferred that appellant impersonated Amy and Courtney on Backpage.com with the vindictive intent to cause them harm.

Appellant responds that the evidence is insufficient because the forensic analyst relied on a partial digital extraction of appellant's electronic devices. And based on that incomplete data, appellant argues that the jury could only speculate that he was the person who committed these offenses, as opposed to some other party who might have exploited his Wi-Fi connection. This argument is not persuasive.

Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). Such speculation does not occur when the jury is capable of considering other facts and deducing a logical consequence from them. *Id.* And here, the forensic analyst explained that the data may have been incomplete simply because it was lost in a temporary browser cache, deleted, or contained on a separate device that was never recovered.

Appellant suggests that there could have been a separate device belonging to Amy or Courtney, who might have gained trusted access to appellant's Wi-Fi connection on an earlier occasion. Appellant further suggests that Amy, Courtney, or some third party subsequently used this device to frame him. But the jury had a substantial basis for rejecting this theory: If a third party had actually intended to

8

frame appellant, there would be little reason for the third party to use a VPN, which had the effect of masking appellant's IP address. The more logical deduction from the evidence is that appellant was the person who created the advertisements, and not some third party.

In any event, because this is a sufficiency challenge, we must view the evidence in the light most favorable to the verdict, which means that even if there were evidence in support of appellant's defensive theory that he was framed, we could not indulge it.

In a separate point, appellant argues that he is entitled to an acquittal because the prosecution produced no evidence that he created the advertisements in Galveston County, which is where the case was tried. This argument is also unpersuasive because venue is not an element of the offense. *See Schmutz v. State*, 440 S.W.3d 29, 34–35 (Tex. Crim. App. 2014) ("Because venue is not an element of the offense, the court of appeals properly determined that failure to prove venue does not implicate sufficiency of the evidence, nor does it require acquittal under *Jackson*.").

Moreover, venue is presumed to be proved in the trial court, unless it was disputed, *see* Tex. R. App. P. 44.2(c)(1), in which case the prosecution must establish that venue is proper by a preponderance of the evidence. *See* Tex. Code Crim. Proc. art. 13.17 ("To sustain the allegation of venue, it shall only be necessary to prove by the preponderance of the evidence that by reason of the facts in the case, the county where such prosecution is carried on has venue."). There was ample evidence in this case that venue was proper. The business records from Comcast established that appellant's IP address was registered to his residence in League City, Texas. And the officer who obtained the warrant to search that residence testified that the residence was located in Galveston County. Insofar as the evidence supported a

9

reasonable conclusion that appellant was responsible for posting the advertisements on Backpage.com, the jury could have reasonably concluded that the prosecution satisfied its burden of showing that appellant created those advertisements from his residence in Galveston County.

We conclude that the evidence was legally sufficient to support every essential element of the offense beyond a reasonable doubt.

## MOTION FOR MISTRIAL

Appellant's next issue arises out of an exchange that occurred at the very beginning of voir dire, which we reproduce here:

| The Court: | Does anyone here know anybody? Does anyone here know any of us? Anybody? Yes? |
| Venireperson: | I know Mr. Dupuy. |
| The Court: | Okay. How do you know Mr. Dupuy? Do you know him personally? |
| Venireperson: | I hired him one time. |
| The Court: | Okay. Thank you. |
| Venireperson: | Yeah. |
| The Court: | All right. Thanks. |
| | Anybody else? |
| Venireperson: | He owes me money. |
| The Court: | Okay. You can stop. Okay? |
| Venireperson: | I'm sorry. |
| The Court: | All right. That's it. |
| | Anybody else know anybody here besides [the venireperson]? Thank you. |
| | Is there anyone else here that knows anybody here? Anybody? |
| | All right. Is there anything about anything that [the venireperson] just said that would influence |

10

anybody in any way? Because, of course, y'all haven't heard anything. All right.

Defense Counsel: Your Honor, let me respectfully move for a mistrial.

The Court: All right. That's denied.

Appellant now challenges this ruling, which he characterizes as the trial court's refusal "to quash the jury panel." For purposes of this opinion, we adhere to the terminology that was used in the trial court and characterize the ruling as a refusal to grant a mistrial, which is the functional equivalent of a refusal to quash the jury panel. *See Alvarez v. State*, 804 S.W.2d 617, 619 (Tex. App.—El Paso 1991) (remarking that the differences between a motion for mistrial and a motion to quash are "purely semantic"), *aff'd*, 864 S.W.2d 64 (Tex. Crim. App. 1993); *see also Young v. State*, 137 S.W.3d 65, 68–70 (Tex. Crim. App. 2004) (where the defendant specifically moved for a mistrial on the grounds that a comment by a venireperson had "polluted the jury panel," the trial court's ruling was characterized as a refusal to grant a mistrial).

The traditional and preferred procedure for seeking a mistrial involves three steps: (1) objecting to a prejudicial event, if possible; (2) requesting an instruction that the jury disregard the prejudicial event; and (3) requesting a mistrial if the moving party believes that the instruction to disregard is insufficient. *See Young*, 137 S.W.3d at 69. When, as here, the moving party's first action is to request a mistrial, the scope of appellate review is limited to the question whether the trial court erred in not taking the most serious action of ending the trial. *Id.* If the prejudicial event could have been prevented by a timely objection or cured by an instruction to disregard, then we may not disturb the trial court's refusal to grant the mistrial. *Id.*

The prejudicial event in this case is the venireperson's unsolicited comment that appellant owed her money. For the sake of argument, we will assume that the

11

comment was unforeseeable, which means that it could not have been prevented by a timely objection. *Id.* at 70 ("If an objectionable event occurs before a party could reasonably have foreseen it, the omission of objection will not prevent appellate review.").

The question then becomes whether the prejudice arising out of the venireperson's comment could have been cured by an instruction to disregard, or if the comment qualified as one of those "extreme circumstances" in which no instruction to disregard would have sufficed. *See Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). For at least three reasons, we hold that the prejudicial comment was curable.

First, the comment was brief, and it did not convey any information at all beyond the alleged existence of a debt. *See Young*, 137 S.W.3d at 71 (concluding that an instruction to disregard would have been sufficient in a case where the venire panel had "minimal information" about the venireperson who made a prejudicial remark).

Second, appellant was on trial for online impersonation, not for anything that could conceivably be related to a debt, like theft. Because the venireperson's comment did not relate to an issue in the case, the prejudice could not have been so great as to be incurable. *Cf. id.* at 71–72 (concluding that an instruction to disregard would have been sufficient even where the venireperson's comment addressed a crucial issue in the case).

And third, before appellant had even moved for a mistrial, the trial court canvassed the venire panel to determine whether anyone would be influenced by the venireperson's comment. The record does not reveal that anyone on the panel answered affirmatively. Based on these circumstances, we cannot say that the venireperson's comment was so extreme as to necessitate a mistrial.

12

Appellant contends that the opposite conclusion is required by this court's decision in *Drake v. State*, 465 S.W.3d 759 (Tex. App.—Houston [14th Dist.] 2015, no pet.). But that case, which involved neither a motion for mistrial nor a motion to quash, was decided on remarkably different facts. The issue there was whether the trial court had erred by holding a venireperson in contempt when the venireperson expressed a religious objection to viewing child pornography. We determined that the trial court had erred, and that the error was fundamental because it had a chilling effect on the rest of the venire panel, which prevented the honest exchange of information during voir dire. That reasoning does not apply to appellant's case because the trial court here did not hold this venireperson in contempt, nor could we say that the trial court's remarks to the venireperson had any sort of chilling effect.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying the motion for mistrial.

## ADMISSION OF BUSINESS RECORDS

When the prosecution offered into evidence the business records from Backpage.com, the defense objected to their admission on the grounds of "constitutionality, hearsay and authentication." A lengthy discussion ensued in which the defense claimed that it did not receive fourteen days' notice of the business records affidavit. The prosecution countered that there was a signed disclosure establishing that the records had been delivered by hand to the defense. The trial court overruled the objection.

The defense then repeated that there was an authentication issue because the custodian of records had represented in her affidavit that the records consisted of only fourteen pages, whereas the prosecution's records consisted of fifteen pages. The defense asserted that one unidentified page "is not supposed to be in there."

The prosecution responded that a formatting issue may have caused a printer to produce an additional page, but the defense countered that the PDF version of the records also contained fifteen pages. The prosecution then argued that the custodian may have made an error in counting the pages, but there was otherwise no indication of a lack of reliability. The defense countered that point by asserting that Backpage.com was a criminal enterprise.

The trial court interjected, "Well, that's argument so far." The trial court then invited the prosecution to authenticate a portion of the records, using Amy as the sponsoring witness. Amy testified that the records contained a copy of the advertisement that had impersonated her, which she recognized from the time that she had visited Backpage.com. Amy further testified that she did not recognize a separate portion of the records, which related to the advertisement impersonating Courtney.

During a voir dire examination, the defense established that the advertisement that Amy had previously seen on Backpage.com was different from the copy contained in the records, which included metadata that had not been published on the website.

The defense again objected to admitting the records because Amy could not properly authenticate even a portion of them. The prosecution offered to introduce the records as a demonstrative exhibit and to establish their admissibility with other witnesses. The trial court declined this offer and overruled all of the defense's objections, admitting the records in their entirety on the basis of the custodian's affidavit.

Appellant now complains of this ruling, in what we discern to be two separate points. In the first point, appellant contends that the business records contained testimonial evidence, and that their admission violated his constitutional rights under

the Confrontation Clause. We conclude that this point has not been preserved for appellate review because it was never presented to the trial court. Appellant's bare objection on the basis of "constitutionality" was not sufficiently specific to apprise the trial court that he was lodging a complaint under the Confrontation Clause. *See* Tex. R. App. P. 33.1 (objections must be specific); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (even a constitutional complaint under the Confrontation Clause can be waived if the objection is not sufficiently specific).

In the second point, appellant reasserts his authentication complaint. Without challenging whether the prosecution had established the predicate for the business records, appellant argues that all of the records should have been excluded because the custodian's affidavit was inaccurate on its face and because the custodian worked for a criminal enterprise.

As the opponent of the evidence, appellant had the burden "to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *See* Tex. R. Evid. 803(6)(E). By admitting the business records over appellant's objections that the affidavit was inaccurate and that the source was unreliable, the trial court implicitly determined that appellant did not satisfy his burden. We cannot say that this determination was an abuse of discretion. The trial court could have reasonably believed that the custodian's misstatement of numbers was a simple clerical mistake. *See Adams v. State*, 985 S.W.2d 582, 584 (Tex. App.—Eastland 1998, pet. ref'd) ("The affidavits before us are not patently false although it is not clear whether the affidavits misstated the number of pages contained in the medical records or whether there are pages missing from the medical records. Whether the affidavits are inaccurate or whether there are pages missing from the medical records should affect the weight to be given the evidence not the admissibility."). Likewise, on this limited record, the trial court could have

reasonably believed that the custodian was credible, even if her organization was facing criminal allegations. *See Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013) (recognizing that trial courts have wide discretion in assessing the credibility of affidavits). The trial court's interjection to the defense's characterization of Backpage.com as a criminal enterprise further supports this conclusion.

## FIRST AMENDMENT CHALLENGES

In his final issue, appellant contends that the online impersonation statute is unconstitutional, both on its face and as applied.

In the facial challenge, appellant argues that the statute violates the First Amendment because it is overbroad and vague. Appellant acknowledges that this court has already considered and rejected the very same facial challenge in *State v. Stubbs*, 502 S.W.3d 218, 232–37 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Nonetheless, appellant asserts his arguments in the interest of preserving error before a higher court. Because his arguments present nothing new, we overrule them, as our precedent requires.

In his as-applied challenge, appellant argues that the statute is unconstitutionally overbroad on the specific facts of this case. Appellant asserts that, if the advertisements were attributable to him, then he was engaged in constitutionally protected speech. Continuing with that premise, he argues that his convictions must be reversed because the statute operates as an impermissible content-based regulation.

Appellant believes that the statute regulates content because a court must first examine the content of his advertisements before it can determine whether an offense has been committed. This point was also raised in *Stubbs*, which rejected appellant's

16

reasoning and held that the statute is content-neutral. *Id.* at 231 ("Moreover, just because the content of the web page or the message may need to be examined does not render the law content based.").

As for whether appellant's particular speech was nonetheless deserving of constitutional protection, we conclude that it was not. The First Amendment affords no protection to communicative conduct in which one individual invades the substantial privacy interests of another in an essentially intolerable manner. *See Scott v. State*, 322 S.W.3d 662, 670 (Tex. Crim. App. 2010), *abrogated on other grounds by Wilson v. State*, 448 S.W.3d 418 (Tex. Crim. App. 2014). The evidence here established the application of that rule: Appellant invaded the substantial privacy interests of Amy and Courtney by posting their personal identifying information to the internet, and this communicative conduct was intolerable because appellant falsely represented that Amy and Courtney were prostitutes without their knowledge or consent. Because the online impersonation statute was applied to conduct that was not entitled to constitutional protection, appellant's overbreadth challenge must fail. *Cf. Wagner v. State*, 539 S.W.3d 298, 311 (Tex. Crim. App. 2018) (rejecting a similar as-applied challenge to the statute for violating a protective order).

## CONCLUSION

The trial court's judgments are affirmed.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Christopher, Wise, and Zimmerer.

Publish — Tex. R. App. P. 47.2(b).